1 | **KAZEROUNI LAW GROUP, APC**
2 | Abbas Kazerounian, Esq. (SBN: 249203)
  | ak@kazlg.com
3 | 245 Fischer Avenue, Unit D1
  | Costa Mesa, California 92626
4 | Telephone: (800) 400-6808
  | Facsimile: (800) 520-5523
5 |
6 | [Additional Counsel on Signature Page]
7 | *Attorneys for Plaintiff,*
  | Shant Joukjian
8 |

9 | **UNITED STATES DISTRICT COURT**
10 | **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SHANT JOUKJIAN, Individually and On Behalf of All Others Similarly Situated,** | **Case No.: 2:25-cv-04771** |
| | **CLASS ACTION** |
| **Plaintiff,** | **COMPLAINT FOR VIOLATIONS OF:** |
| **v.** | 1) **CALIFORNIA CONSUMER LEGAL REMEDIES ACT ("CLRA"), CAL. CIV. CODE §§ 1750, *ET SEQ.*;** |
| **DR PEPPER/SEVEN UP, INC.; and KEURIG DR PEPPER INC.,** | 2) **CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*;** |
| **Defendants.** | 3) **VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL"), CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*;** |
| | 4) **BREACH OF EXPRESS WARRANTY** |
| | 5) **UNJUST ENRICHMENT;** |
| | 6) **NEGLIGENT MISREPRESENTATION; AND,** |
| | 7) **INTENTIONAL MISREPRESENTATION.** |
| | **JURY TRIAL DEMANDED** |
| | **ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF** |

## INTRODUCTION

1.    Plaintiff Shant Joukjian ("Plaintiff" or "Mr. Joukjian"), individually and on behalf of all others similarly situated, brings this class action complaint ("Complaint") for damages, injunctive relief, and any other available legal or equitable remedies resulting from the unlawful actions of Defendants Dr Pepper/Seven Up, Inc. ("Dr. Pepper/Seven Up" or "DPSU") and Keurig Dr Pepper Inc. ("Keurig Dr. Pepper"), doing business as 7-Up® (collectively "KDP" or "Defendants").

2.    This Complaint concerns the illegal, unfair, and deceptive labeling, marketing, and sale of KDP's beverage products as being made with "100% Natural Flavors," "All-Natural Flavors," and the like.

3.    The unlawfully and deceptively represented products are sold through multiple channels, including, but not limited to, direct-to-consumer sales via KDP's Amazon.com ("Amazon") store, as well as through third-party merchants operating both brick-and-mortar locations and online platforms. These include, but are not limited to, Walmart, Target, Albertsons, Kroger, CVS, Walgreens, and numerous other retailers throughout the United States.

4.    Mr. Joukjian alleges as follows upon personal knowledge as to himself and his own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by his attorneys.

5.    In the highly competitive beverage industry, companies sometimes seek to gain an unfair advantage by misleading consumers about the nature and quality of their products. KDP manufactures, markets, and sells products that are labeled and marketed as containing "100% Natural Flavors," "All-Natural Flavors," and substantially similar representations. In reality, these products contain significant amounts of synthetic ingredients that are integral and indispensable to their flavor systems, rendering the labeling false, deceptive, misleading, and fraudulent.

6.      Numerous federal and state laws, rules, and regulations govern the proper labeling of consumer products, including beverages.

7.      For example, the Federal Food, Drug, and Cosmetic Act ("FDCA"), and various state laws[1] that generally align with the FDCA govern the aspects of food and beverage labeling discussed herein. These laws reflect a fundamental principle: **consumers have the right to know what they are purchasing and consuming**.

8.      When companies misrepresent the presence of key ingredients, fail to disclose the true nature of components that materially affect product flavor or composition, mischaracterize the nature of their formulations, or falsely imply that certain ingredients are natural or derived from natural sources, they violate fundamental consumer protection laws. Such conduct erodes consumer trust, distorts fair competition, and grants deceptive actors an improper advantage in the marketplace.

9.      Under both the FDCA and the Sherman law, a food is considered misbranded if its labeling is false or misleading in *any particular*.[2] This includes representations about the nature, source, or quality of ingredients, including claims regarding whether flavors are "natural."

10.     Defendants' 7-Up® beverage products are labeled, marketed, and sold in the United States as being made with "100% Natural Flavors," "All-Natural Flavors," and the like, thereby expressly warranting that they contain no artificial flavoring ingredients and that no synthetic substances contribute to their flavor systems, including the flavor experienced by consumers. In reality, these products contain synthetic ingredients—including key flavoring compounds—rendering such representations false and misleading under both federal and California law.

11.     Defendants' 7-Up® lemon-lime flavor beverages (the "Product(s)") purchased by Plaintiff were, and continue to be, falsely represented as containing "100%

---

[1] *See* California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code §§ 109875–111915.

[2] *See* 21 U.S.C. § 343(a); Cal. Health & Safety Code § 110390, 110395, 110398.

Natural Flavors," despite the presence of synthetic ingredients that materially contributed to the Products' flavor.

12.   As stated by the California Supreme Court in *Kwikset v. Superior Court*, 51 Cal. 4th 310, 328-29 (2011):

> **Simply stated: labels matter.** The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities that may come to associate with a particular source. . .

13.   Defendants' conduct of labeling, marketing and selling deceptively labeled products bearing the aforementioned misrepresentation(s) violates: (1) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (2) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (3) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; and constitutes (4) breach of express warranty; (5) unjust enrichment; (6) negligent misrepresentation; and (7) intentional misrepresentation.

14.   Defendants' conduct of labeling, marketing and selling deceptively labeled products bearing the aforementioned misrepresentations also violates the FDCA and the Sherman Law.

15.   This conduct caused Plaintiff, and other similarly situated consumers, damages, and requires restitution and injunctive relief to remedy and prevent future harm.

16.   In addition to the "100% Natural Flavors" claims on the Products purchased by Plaintiff, upon information and belief, many of Defendants' other substantially similar 7-Up® beverages—including, but not limited to, 7-Up® Lemon-Lime, 7-Up® Lemon-Lime Zero Sugar (f/k/a Diet 7-Up®), and 7-Up® Cherry (collectively, with

the Product purchased by Plaintiff, the "Class Products")[3]—are, or have been marketed and sold using the same unlawful, unfair, and deceptive "100% Natural Flavors," "All-Natural Flavors," or other similar claims.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because: (1) there is minimal diversity as Plaintiff is a citizen of the State of California, Dr. Pepper/Seven Up, Inc. is a Delaware corporation with its principal place of business in Texas, and Keurig Dr. Pepper, Inc. is a Delaware corporation with its principal place of business in Texas;[4] (2) the amount in controversy in this matter exceeds $5 million, exclusive of interest and costs; and (3) there are more than one hundred (100) people in the putative class.

18.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in Los Angeles County, California, which is within this judicial district; (ii) a substantial part of the conduct complained of herein occurred within this judicial district; (iii) Defendants conducted business within this judicial district at all relevant times.

## PARTIES

19.    Mr. Joukjian is, and at all times mentioned herein was, a natural person, an individual citizen and resident of Los Angeles County, California.

---

[3] Class Products include all seasonal variations and limited editions of 7-Up®—whether or not specifically identified herein—that bear the representations "100% Natural Flavors," "All-Natural Flavors," or similar claims.

[4] According to the California Secretary of State's website, Dr. Pepper Inc. (Control ID 1673667) is a Delaware corporation that has been registered to do business in California since September 27, 1990 and Keurig Dr. Pepper Inc. (Control ID 2954422) is a Delaware corporation that has been registered to do business in California since May 19, 2008.

20.     Dr. Pepper/Seven Up, Inc. is a corporation that is organized and exists under the laws of Delaware, with its principal place of business in Texas located at 6425 Hall of Fame Lane, Frisco, Texas 75034.[5]

21.     Similarly, Keurig Dr. Pepper, Inc. is a corporation that is organized and exists under the laws of Delaware, with its principal place of business in Texas located at 6425 Hall of Fame Lane, Frisco, Texas 75034.[6]

22.     Defendants manufacture, distribute and sell beverage and releated food products that conduct business: (a) direct-to-consumer through their Amazon store; (b) through the websites of third-party vendors, including, but not limited to, CVS.com, Walgreens.com, Walmart.com, Target.com, Albertsons.com, and Kroger.com, among others; and (c) through the distribution of their products to be sold in grocery stores, convenience stores, movie theaters, amusement parks, sports and entertainment venues, hotels, airports, and vending machines, including, but not limited to, 7-Eleven, CVS, Target, AMPM, and Rite Aid, among others.

23.     Mr. Joukjian alleges that, at all relevant times, Defendants conducted business within the State of California, in Los Angeles County, and within this judicial district.

24.     Unless otherwise indicated, the use of Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendants, respectively.

## NATURE OF THE CASE

25.     Keurig Dr. Pepper is a publicly traded beverage company with roots dating back to 1981.[7] Today, Keurig Dr. Pepper is one of the largest beverage company's in the United States with a portfolio of beverage products including some of the

---

[5] According to the California Secretary of State's website.

[6] *Id.*

[7] *See* https://pitchbook.com/profiles/company/41113-00#stock (last accessed May 6, 2025)

most iconic beverage products sold in the United States today including, but not limited to, 7-Up, Dr. Pepper and Canada Dry.

26.    Dr. Pepper/Seven Up, Inc. is a wholly owned subsidiary of Keurig Dr. Pepper and serves as the entity through which Keurig Dr. Pepper markets and sells the Products purchased by Plaintiff. On information and belief, for all practical purposes, Dr. Pepper/Seven Up and Keurig Dr. Pepper operate as a single, unified business enterprise.

27.    Defendants produce, market and sell a wide portfolio of beverage products through multiple distribution channels including, but not limited to, their Amazon store, through third-party retailers online as well as in brick and mortar stores, and elsewhere. In 2024, Keurig Dr. Pepper reported an annual revenue of $15.35 billion, of which $9.3 billion was from its "U.S. Refreshment Beverages" category which includes the Class Products.[8]

28.    As a direct result of their size and commercial success, Defendants possess financial, technical, legal, and regulatory resources that rank among the most extensive and sophisticated in the food and beverage industry.

29.    Given Defendants' long-standing presence in the food and beverage industry—and their vast resources and operational sophistication—it is difficult to comprehend how they could so blatantly disregard the well-established laws, rules, and regulations governing the labeling, marketing, and sale of beverage products.

30.    At all relevant times, Defendants made and continue to make material misrepresentations regarding the Class Products either directly or through their agents.

31.    Specifically, Defendants labeled, packaged, marketed, and sold the Class Products as containing "100% Natural Flavors," "All-Natural Flavors," and the like,

---

[8] *See Keurig Dr. Pepper Reports Q4 and Full Year 2024 Results and Provides 2025 Outlook,* https://keurigdrpepper.com/keurig-dr-pepper-reports-q4-and-full-year-2024-results-and-provides-2025-outlook/ (last accessed April 21, 2025).

when, in reality, they contain multiple synthetic ingredients that contribute to the Class Products' flavor—including one that is a primary driver of the overall flavor profile. These claims are false, unlawful, unfair, and deceptive, and they continue to be made to this day.

32.    Each consumer, including Plaintiff, was exposed to the same material misrepresentations, as substantially similar labels, packaging and/or marketing materials were used in connection with all Class Products sold—and currently being sold—throughout the United States, including within the State of California.

33.    Federal and state laws, rules, and regulations regarding the labeling of consumer products are well-established and clearly defined. Specifically, under the FDCA and the Sherman Law, a food is considered misbranded if its labeling is false or misleading in any particular.

34.    As a direct result of Defendants' unfair and deceptive practices, Plaintiff and other similarly situated consumers purchased the Class Products based on false impressions and in reasonable reliance on Defendants' material misrepresentations.

35.    As a result, Plaintiff and other similarly situated consumers overpaid for the Class Products, purchased the Class Products over the products of competitors, and/or purchased the Class Products under the belief that the Defendants' representations were accurate, truthful and lawful. This includes both initial and repeat purchases of the Class Products made by consumers who saw and relied upon Defendants' "100% Natural Flavors," "All-Natural Flavors," or other similar claims on or in connection with the Class Products.

36.    Despite clearly established and well-defined federal and state laws, rules, and regulations—including consumer protection laws—governing the labeling, marketing, and sale of food and beverage products in the United States, Defendants falsely, unfairly, and deceptively advertised, marketed, and sold their products, including the Products purchased by Plaintiff, as further detailed herein.

37.    Had Plaintiff been aware that the labeling and marketing of the Class

Products contained false and deceptive misrepresentations, he would not have purchased the Class Products or would have paid less for them.

38.    As a result of Defendants' false, unfair, and deceptive representations—and their failure to disclose the true nature of the flavoring ingredients used in the Class Products—consumers nationwide, inclusive of Plaintiff, purchased tens of millions of units of the Class Products across the United States, including in California, and have suffered, and continue to suffer, harm, including the loss of money and/or property.

39.    Defendants' conduct regarding the labeling, marketing, and sale of the Class Products, as alleged herein, violates California laws as well as well-established common law and federal regulations, as detailed below.

40.    This action seeks, among other things, actual damages and prospective injunctive relief (including public injunctive relief), and in the alternative restitution and disgorgement of all ill-gotten profits resulting from Defendants' alleged wrongdoing.

41.    Unless enjoined, Defendants' unfair, deceptive and unlawful conduct will continue into the future, and Plaintiff and members of the Classes will continue to suffer harm through the purchase of Defendants' misbranded Class Products in the marketplace.

## FACTUAL ALLEGATIONS

42.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

43.    At all relevant times, including as of the filing of this Complaint, Defendants have made material misrepresentations regarding the Class Products either directly or through their agents.

44.    Defendants produce, market, advertise and sell certain of their products, including the Products purchased by Plaintiff, as being made with "100% Natural Flavors."

45.    The term "Natural Flavor" is well-defined under United States law.[9] In general, it refers exclusively to flavoring substances that are derived from natural sources, including plant or animal materials.

46.    The legal definition of "Natural Flavor" does not encompass substances produced synthetically, including those synthesized by genetically modified or mutated strains of mold. Additionally, consumers' understanding of "Natural Flavor" does not encompass synthetic ingredients that drive or contribute to the overall flavor experience.

47.    In the food and beverage industry, natural flavors are highly valued by consumers and frequently used in products targeted at health-conscious individuals. Companies often include natural flavors—and prominently advertise their use—to enhance the perceived healthfulness of their products, boost sales, gain a competitive edge, and avoid public scrutiny.

48.    Consumers, including Plaintiff, favor products labeled or marketed as "natural," associating them with health benefits and safety. A recent Acosta Group study found that 59% of shoppers prioritize natural and organic groceries and household products, primarily due to perceptions of better health and fewer synthetic additives.[10] In the same study, younger consumers showed an even stronger preference for natural and organic products, with 89% of Gen Z and 85% of Millennials reporting they purchased such items within the past six months.

---

[9] *See* 21 C.F.R. § 101.22(a)(3) ("The term *natural flavor* or *natural flavoring* means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional. Natural flavors include the natural essence or extractives obtained from plants listed in §§ 182.10, 182.20, 182.40, and 182.50 and part 184 of this chapter, and the substances listed in § 172.510 of this chapter.") (emphasis in original)

[10] *See* https://shorturl.at/LLnFZ (last accessed April 21, 2025).

Additionally, research published in the Journal of Consumer Research indicates that consumers prefer natural products more strongly when used for prevention rather than cure, as they are perceived to be safer.[11] Given the widespread recognition of the term "Natural Flavors," consumers are attracted to products that contain them— and even more so to those that are marketed as being made with "100% Natural Flavors," "All-Natural Flavors," or other synonymous terminology.

49.     Consumers, including Plaintiff, have sought out products labeled as containing "100% Natural Flavors," "All-Natural Flavors," or other similar language, relying on such representations as an express warranty that the product contains no synthetically created flavoring ingredients that contribute to their flavor systems or overall flavor experience. This claim also signals to consumers that the product is generally more natural and healthful overall.

50.     As a result, representations such as "100% Natural Flavors" and "All-Natural Flavors" have become a significant factor in consumer purchasing decisions, leading consumers to prefer—and ultimately purchase—products that prominently make such claims over those that do not.

51.     Recognizing this consumer demand, KDP deliberately sought to exploit it by prominently marketing the Products with bold and conspicuous "100% Natural Flavors," "All-Natural Flavors," or other similar claims—both in advertising and on product packaging—in order to capitalize on consumers' recognition of, and preference for, such representations.

52.     KDP sought to capitalize on consumers' preferences by promoting the Class Products not merely with a vague or general "natural flavors" claim, but with highly specific assertions of "***100%*** Natural Flavors," "***All***-Natural Flavors" (emphasis added), and similar representations.

53.     A reasonable consumer understands that when a product explicitly claims to be made with "100% Natural Flavors," "All-Natural Flavors," and the like, it does

---

[11] *See* https://shorturl.at/NdFk4 (last accessed April 21, 2025).

KAZEROUNI
LAW GROUP, APC

not contain flavoring ingredients that are synthetically derived or sourced from anything other than natural materials.

54. In the case of the Class Products, KDP's representation that they contain "100% Natural Flavors," "All-Natural Flavors," and the like, appears on the packaging and is consistently featured throughout the marketing and promotional materials for the Class Products, including materials distributed to retailers.

55. Below are non-exhaustive examples of the aforementioned representations regarding the Class Products.[12]

---

[12] *See* https://a.co/d/1zQIc5U (last accessed April 21, 2025).

https://www.walmart.com/ip/7-Up-Soda-2-l/16777395?classType=REGULAR&athbdg=L1200&from=/search (last accessed April 21, 2025).

https://www.walmart.com/ip/7UP-Caffeine-Free-Lemon-Lime-Soda-Pop-12-fl-oz-12-Pack-Cans/16777397 (last accessed April 21, 2025).

https://www.target.com/p/7up-lemon-lime-soda-12pk-12-fl-oz-cans/-/A-12989421#lnk=sametab (last accessed April 21, 2025).

https://www.target.com/p/7up-lemon-lime-soda-20-fl-oz-bottle/-/A-12989443#lnk=sametab (last accessed April 21, 2025).

https://www.ralphs.com/p/7up-lemon-lime-soda/0007800001080 (last accessed April 21, 2025).

https://www.albertsons.com/shop/product-details.108050616.html (last accessed April 21, 2025).

https://www.walgreens.com/store/c/7-up-soda-lemon-lime,-2-liter-bottle/ID=prod6061638-product (last accessed April 21, 2025).

https://www.walgreens.com/store/c/7-up-soda-lemon-lime,-2-liter-bottle/ID=prod6061563-product (last accessed April 21, 2025).

https://www.walgreens.com/store/c/7-up-lemon-lime-soda-lemon-lime,-12-pack/ID=prod6061618-product (last accessed April 21, 2025).

https://www.cvs.com/shop/7-up-bottle-2l-prodid-1190773 (last accessed April 21, 2025).
https://www.samsclub.com/p/7up-lemon-lime-soda-12-fl-oz-24-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



https://www.example.pk/P03010850?xid=plp_product_17 (last accessed April 21, 2025).
https://www.walmart.com/ip/7UP-Caffeine-Free-Cherry-Soda-Pop-12-fl-oz-12-Pack-Cans/16777399 (last accessed May 1, 2025).

https://a.co/d/898PGJW (last accessed May 6, 2025)









1

2

3

4

5

6

7

8

9



10

11

12

13

14

15

16

17

18

19



20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28















56.    The representation, "100% Natural Flavors," for instance, is a core component of the marketing strategy for the Product and the Class Products. This claim appeared prominently on KDP's website as recently as December 2024[13] and, upon information and belief, continued into 2025. Below is an image that appeared on KDP's website displaying the "100% Natural Flavors" representation:

---

[13] *See* https://web.archive.org/web/20241229154908/https://www.7up.com/en/products/7up



57.    Contrary to KDP's prominent claims of "100% Natural Flavors," and its other similar claims, the Class Products—including the Products purchased by the Plaintiff—do not consist exclusively of natural flavors. Instead, they incorporate industrially manufactured citric acid ("MCA"), a synthetic compound that significantly influences the flavor profile of the Class Products.

58.    Citric acid, an organic compound with the formula $C_6H_8O_7$, is a colorless organic acid that occurs naturally in citrus fruits.

59.    Citric acid is a key acid widely used in the food and beverage industry, valued both as a preservative and a flavoring agent.

60.    Although citric acid can be naturally derived from citrus fruits, this method of production has been largely abandoned due to economic inefficiency, agricultural limitations, lack of standardization, and other practical constraints.[14] Instead, the citric acid used in many commercial products—including the Class Products—is industrially synthesized through a process involving genetically

---

[14] *See* Lotfy WA, Ghanem KM, El-Helow ER. *Citric Acid Production by a Novel Aspergillus niger Isolate: II. Optimization of Process Parameters Through Statistical Experimental Designs*. 98 BIORESOURCE TECH. 3470 (2007). ("The supply of natural citric acid is limited and the demand can only be satisfied by biotechnological fermentation processes."); Max B, Salgado JM, Rodriguez N, *et. al. Biotechnological production of citric acid*. 4 BRAZ. J. MICROBIOL. 862 (2010). ("About 99% of world production of citric acid occurs via microbial processes, which can be carried out using surface or submerged cultures.")

mutated mold (*Aspergillus niger*), a method fundamentally distinct from natural extraction from citrus fruit.

61.    Citric acid produced through the above-described industrial synthesis is commonly referred to as MCA.

62.    Given its distinct tart, tangy and sour taste, MCA is frequently used to enhance or create sour or citrus flavors in food and beverage products,[15] such as KDP's citrus flavored beverages. While citric acid naturally occurs in citrus fruits—particularly lemons, limes and oranges, where it can constitute up to 8% of their dry weight [16]—MCA is a synthetic alternative used in products such as the Class Products.

63.    The industrial synthesis of MCA involves introducing a sucrose- or glucose-containing medium to carefully selected and genetically mutated *Aspergillus niger* under highly controlled and optimized conditions.[17] In response to these conditions, *Aspergillus niger* metabolizes the sugars and synthesizes citric acid.

64.    Citric acid is not present in either the sugar medium or the *Aspergillus niger* itself prior to synthesis, and thus cannot be extracted, as can be done from natural sources such as citrus fruits. This method of production stands in stark contrast to the definition of "natural flavor" in 21 C.F.R. § 101.22(a)(3). *See, supra,* n.9.

65.    Even after the mutated *Aspergillus niger* metabolizes the sugar medium—along with other introduced catalysts—to fuel its growth and produce a citric acid derivative as a byproduct, that derivative is not immediately usable.[18] It must

---

[15] *See* Penniston KL, Nakada SY, Holmes RP, Assimos DG. *Quantitative assessment of citric acid in lemon juice, lime juice, and commercially-available fruit juice products*. 22 J ENDOUROL. 567 (2008).

[16] *Id*.

[17] *See* Max, *et al*., *supra*. n. 8 ("Although many microorganisms can be employed to produce citric acid, *A. niger* is still the main industrial producer. In fact, *specific strains that are able to overproduce citric acid* in different types of fermentation processes *have been developed*.") (emphasis added)

[18] *See* Mores S, Porto de Souza Vandenberghe L, Magalhães AI, et. al. *Citric acid*

---

undergo a series of chemically intensive processes. Specifically, the compound is first reacted with non-natural sulfuric acid,[19] then subjected to further refinement steps including adsorption using resins and activated charcoal, evaporation, crystallization, and drying. [20] Only after these steps is the purified, biotechnologically synthesized citric acid (or MCA) ultimately produced. This method of production further underscores the departure from any reasonable definition of "natural," involving genetically modified organisms, non-natural catalysts and extensive chemical processing that defy consumer expectations.

66.    In addition to MCA, the Product contains potassium citrate, another synthetic ingredient,[21] which has a saline flavor profile,[22] further contributing to the Product's flavor. Similarly, Defendants utilize potassium citrate in another Class Product, specifically 7-Up Zero Sugar Lemon-Lime (f/k/a Diet 7-Up).

67.    Defendants' inclusion of synthetic ingredients that contribute to the flavor of the Class Products is not immaterial. Specifically, MCA (labeled as "citric acid") and potassium citrate both appear _before_ "natural flavors" in the ingredient statements of the Product purchased by Plaintiff, indicating their greater relative weight or concentration.

68.    Below is a non-exhaustive example of the aforementioned ingredient

_bioproduction and downstream processing: Status, opportunities, and challenges_. 320 BIORESOURCE TECHNOLOGY 124426 (2021)

[19] _See_ https://pubchem.ncbi.nlm.nih.gov/compound/Sulfuric-Acid ("Pure sulfuric acid is not encountered naturally on Earth in its anhydrous form, due to its great affinity for water.") (last accessed April 21, 2025)

[20] _See supra_ n. 14.

[21] _See_ 21 C.F.R. §184.1625(a) ("Potassium citrate … is the potassium salt of citric acid. It is prepared by neutralizing citric acid with potassium hydroxide or potassium carbonate. It occurs as transparent crystals or a white granular powder, is odorless and deliquescent, and contains one mole of water per mole of potassium citrate.")

[22] _See_ https://xitrical.com/application-of-potassium-citrate-in-beverages-and-formulation-optimization/ ("It appears as white crystals or powder, dissolves easily in water, and has a mildly sour taste.")

statement.

**7-Up Lemon-Lime[23]**

**INGREDIENTS**

FILTERED CARBONATED WATER, HIGH FRUCTOSE CORN SYRUP, CITRIC ACID, POTASSIUM CITRATE, NATURAL FLAVORS, CALCIUM DISODIUM EDTA (TO PROTECT FLAVOR)

69.     The placement of citric acid before "natural flavors" in the Products' ingredient statements underscores the significance of MCA to the overall flavor profile. If MCA were removed or substantially reduced, the flavor of the Product would be materially altered. In other words, synthetic, non-natural MCA is a critical component of the flavor in the Products and the Class Products that are marketed as containing "100% Natural Flavors," "All-Natural Flavors," and the like.

70.     Similarly, if potassium citrate were removed or substantially reduced in the Product, its flavor would also be materially affected, further underscoring the role of synthetic ingredients in shaping the taste of Products marketed as containing "100% Natural Flavors," "All-Natural Flavors," and the like.

71.     Even if citric acid appeared after natural flavors in the ingredient statements of the Class Products, its potent taste ensures that any amount contributes meaningfully to their flavor systems and overall flavor experience. In short, synthetic flavoring ingredients—including, but not limited to, citric acid and potassium citrate—are integral to the Class Products' flavor profiles.

72.     The position of citric acid in the Products' ingredient statements renders KDP's subjective purpose or intent immaterial, as both the potency of citric acid's flavor and its relative quantity in the Products and Class Products have a significant impact on their overall flavor profiles.

---

[23] *See* https://www.7up.com/en/products/7up (last accessed April 21, 2025)

73.     Given the significant impact of MCA on flavor, it is highly likely that the quantity of MCA in the Class Products was either specifically determined or carefully adjusted by Defendants experts responsible for formulating the Class Products' flavor profiles. The details surrounding the development of these flavor profiles remain exclusively within Defendants' knowledge. Accordingly, Plaintiff cannot fully allege the extent of Defendants' experts' involvement or knowledge without the benefit of discovery. The same is true for the inclusion of potassium citrate.

74.     As yet another example of Defendants' misleading use of "100% Natural Flavors," Defendant's Zero Sugar (f/k/a Diet 7-Up) products—marketed as containing zero sugar—rely not on one, but two well-known and controversial fully artificial sweeteners: aspartame[24] and acesulfame potassium.[25]

75.     While KDP may argue that sweetness does not constitute "flavor," no reasonable consumer would agree. Sweetness is a fundamental component of how flavor is experienced. If the aspartame and acesulfame potassium were removed from the KDP's Zero Sugar products, no consumer would recognize the resulting beverage as tasting like the lemon-lime or other flavors represented on the product labels. Ultimately, no reasonable consumer would expect a product labeled and/or marketed as containing "100% Natural Flavors" to also include two entirely artificial sweeteners.

76.     Furthermore, Defendants include a synthetic preservative—specifically

---

[24] *See* https://pubchem.ncbi.nlm.nih.gov/compound/Aspartame ("Commonly used as an artificial sweetener. It has a role as a sweetening agent, a nutraceutical, a micronutrient, a xenobiotic, an environmental contaminant, an apoptosis inhibitor and an EC 3.1.3.1 (alkaline phosphatase) inhibitor.") (last accessed April 17, 2025).
[25] *See* https://www.ncbi.nlm.nih.gov/books/NBK576288/ ("Acesulfame potassium is an artificial sweetener used throughout the world. It is currently available as a dry powder for use in food and beverages and is present as a flavoring agent in numerous food items and diet drinks; therefore, there is extensive human exposure.") (last accessed April 17, 2025).

calcium disodium EDTA[26]—under the pretense of "protecting flavor." If this additive indeed functions "to protect flavor," then it necessarily contributes to the flavor, flavor system, and overall flavor experience of the Class Products. Its presence directly contradicts and further undermines Defendants' representation that the Class Products contain "100% Natural Flavors," "All-Natural Flavors," and the like.

77.    KDP's "100% Natural Flavors" claim is highly deceptive and misleading because, among other reasons, a primary contributor to the citrus flavor in the Class Products—MCA—is not natural, but synthetic. While citric acid does occur naturally in fruits such as lemons, limes, and oranges, and was historically extracted from these sources, modern production relies on industrial synthesis. Although advancements in biotechnology have made this method efficient, it does not yield citric acid from a natural source, nor does it align with the regulatory definition of a "natural flavor."

78.    As a result of the "100% Natural Flavors" and other similar representations on the Class Products packaging and in their advertising, retailers have further propagated this misrepresentation through their websites' product pictures and descriptions, in addition to continuing to sell the Class Products with "100% Natural Flavors" and other similar misrepresentations on their shelves, where applicable.[27]

79.    Defendants' unqualified "100% Natural Flavors" and other similar misrepresentations were also prominently displayed in the "About this item" section of their Amazon product pages.[28]

---

[26] *See* https://www.chm.bris.ac.uk/motm/edta/synthesis_of_edta.htm ("Today EDTA is synthesized on an industrial scale from ethylenediamine, formaldehyde, and a source of cyanide such as HCN or NaCN.")

[27] For illustrative examples of Defendants' "100% Natural Flavors" (or similar) claims appearing on Amazon, Target.com, Walmart.com, Walgreens.com and other retailer sales pages, see ¶ 55, *supra* and ¶ 91, *infra*.

[28] *Id.*

---

80.    As a result of Defendants' false "100% Natural Flavors" and other similar claims, the Class Products obtained an unfair competitive advantage across social media platforms, search engine algorithms, and Amazon search results—harming both consumers and legitimate competitors in the marketplace.

81.    One of the methods Defendants used to advance their deceptive "100% Natural Flavors" and other similar claims was through social media marketing and influencer partnerships—the full scope of which is known only to Defendants and their marketing agencies at this time.

82.    Defendants' misleading and deceptive claims regarding "100% Natural Flavors," "All-Natural Flavors," and the like, misleads consumers into purchasing products that do not meet their expectations. This deception causes financial harm, poses potential physical risks,[29] and undermines consumer trust in product labeling. As a result, consumers, including Plaintiff, did not receive the "100% Natural Flavors," "All-Natural Flavors," and the like, or their associated benefits that they paid for and were unknowingly exposed to synthetic flavoring ingredients—without their consent.

83.    As a result of Defendants' "100% Natural Flavors," "All-Natural Flavors," and similar claims on the Class Products' packaging and in their marketing, consumers have been misled for years into making both initial and repeat purchases of products they reasonably believed contained no synthetic flavoring ingredients.

84.    Had Plaintiff and other similarly situated consumers been made aware that the Class Products contained a substantial amount of synthetic flavoring

---

[29] *See* Sweis, IE, Cressey, BC. *Potential Role of the Common Food Additive Manufactured Citric Acid in Eliciting Significant Inflammatory Reactions Contributing to Serious Disease States: A Series of Four Case Reports*. 5 TOXICOL. REP. 808 (2018) ("We believe that ingestion of the MCA may lead to a harmful inflammatory cascade which manifests differently in different individuals based on their genetic predisposition and susceptibility, and that the use of MCA as an additive in consumable products warrants further studies to document its safety.")

ingredients, they would not have purchased the Class Products or would have paid less for them.

85.    Defendants possess superior knowledge of the true facts, which were not disclosed, thereby tolling the applicable statute of limitations.

86.    On information and belief, Defendants either charged a premium for the Class Products compared to their competitors or gained a significant competitive advantage by misleading consumers into choosing their products over others based on false "100% Natural Flavors," "All-Natural Flavors," or other similar claims. Federal and California laws are specifically designed to protect consumers from such false, deceptive, misleading, and unlawful representations, as well as from predatory business practices that unfairly manipulate consumer choice.

## FACTS SPECIFIC TO PLAINTIFF SHANT JOUKJIAN

87.    On March 16, 2025, Plaintiff searched online for beverages made with natural flavors from his home in Los Angeles County, California.

88.    While searching online, Plaintiff found the Product available for sale on Amazon.

89.    In the images displayed on the Product's Amazon listing, Plaintiff observed that the Product's packaging prominently stated "100% Natural Flavors." This representation was not limited to the packaging alone; the Product's description on Amazon also reiterated the "100% Natural Flavors" claim. Relying on these representations—as would any reasonable consumer—and with the intent to purchase a beverage free from synthetic flavoring ingredients, Plaintiff purchased a 24-can pack of the Product for $26.50 (excluding shipping and tax), for his personal use.

90.    In addition to the false "100% Natural Flavors" representation on the Product's Amazon listing, Defendants also deceptively claim that the Product is "Stripped of *artificial flavors **and** preservatives*" (emphasis added), which is not true. Specifically, the Product contains ingredients such as MCA, potassium citrate,

and calcium disodium EDTA—each of which functions both as a component of the Product's flavor and as a preservative.

91.     Below are non-exhaustive examples of the images and representations that Plaintiff observed prior to his purchase. These same images and claims remain visible on the Product's Amazon listing as of the date of this filing.[30]



---

[30] *See* https://a.co/d/2D00Xc8 (last accessed May 1, 2025)



92.    Plaintiff's reliance on Defendants' representations was reasonable given the circumstances, as ordinary consumers are not experts in beverage product formulations or the true nature or origins of ingredients. They have no reason to doubt such claims or suspect that a manufacturer would deliberately misrepresent the contents of a product, especially when such claims are prominently displayed on the product's labels and in its marketing.

93.    For instance, when a consumer encounters an explicit representation such as "*100%* Natural Flavors" on a product's labeling or marketing, they reasonably expect that the product contains *only* natural flavoring ingredients and is free from synthetic ones. A reasonable consumer would not anticipate that the product is significantly—or even predominantly—flavored with synthetically produced ingredients.

94.    Defendants' representations regarding the Product and the Class Products were unlawful, unfair, deceptive, and misleading, as they contain synthetic,

chemically derived, or otherwise non-natural ingredients that contribute a significant—if not predominant—part of the Product's and Class Products' flavor.

95.    Accordingly, Defendants are not entitled to lawfully make "100% Natural Flavors" or other similar claims that they made on and regarding the Product and the Class Products.

96.    Defendants' representations were material to Plaintiff's decision to purchase the Product.

97.    In deciding to purchase the Product, Plaintiff relied on the labeling, marketing, and/or advertising prepared and approved by Defendants and their agents, as disseminated through the Product's and the Class Products' packaging and marketing containing the misrepresentations alleged herein.

98.    Had Plaintiff known that the Product did not contain only naturally derived flavoring ingredients, and instead included synthetic flavoring ingredients, he would not have purchased the Product or would have paid less for the Product.

99.    In other words, Defendants' "100% Natural Flavors" representation was important to Plaintiff's decision to purchase the Product.

100.    Plaintiff believed, at the time of purchase, that the Product was of superior quality and more healthful than comparable products that do not claim to be made with "100% Natural Flavors."

101.    Each time Plaintiff and members of the Classes purchased Class Products, they relied on Defendants' representations in their purchasing decisions, as is typical of most U.S. consumers.

102.    After purchasing the Product, Plaintiff learned that the Product was flavored with synthetically produced ingredients.

103.    As a result, Plaintiff was harmed because Defendants took Plaintiff's money due to their unlawful, false, unfair, and deceptive misrepresentations on the Class Products, including the Product that Plaintiff purchased.

104.    Consequently, Plaintiff and other similarly situated consumers were deceived

by Defendants' unlawful actions and suffered harm as a direct result of Defendants' false, unlawful, unfair, and deceptive representations.

105.  The Class Products, including the Product purchased by Plaintiff, contain synthetic flavoring ingredients and are not worth the purchase price paid by Plaintiff and members of the Classes.

106.  The precise amount of damages will be proven at the time of trial.

107.  This false, unlawful, unfair, and deceptive advertising of the Class Products by Defendants presents an ongoing threat to consumers, as Defendants' conduct continues to this day.

108.  Although Plaintiff would like to purchase the Class Products in the future, he cannot be certain that he will not be misled again unless and until Defendants and their agents accurately represent the Class Products.

## CLASS ALLEGATIONS

109.  Plaintiff brings this action on behalf of himself and all others similarly situated.

110.  Plaintiff is a member of and seeks to represent a National Class, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in the United States who purchased one or more of the Class Products that were marketed or represented as being made with "100% Natural Flavors," "All-Natural Flavors" or any similar representation— whether on the product packaging or in marketing materials.

111.  Plaintiff is also a member of and seeks to represent a California Sub-Class, pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2) and 23(b)(3), defined as:

> All persons in California who purchased one or more of the Class Products that were marketed or represented as being made with "100% Natural Flavors," "All-Natural

Flavors" or any similar representation—whether on the product packaging or in marketing materials.

112.  The National Class and the California Sub-Class are referred to collectively as the "Class(es)."

113.  Excluded from the Classes are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Further excluded from the Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

114.  Plaintiff reserves the right to modify the proposed definition of the Classes, including but not limited to expanding the Classes to protect additional individuals and to assert additional sub-classes as warranted by additional investigation.

115.  <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of members of the Classes is unknown to Plaintiff at this time, based on information and belief, the Classes each consist of hundreds of thousands to hundreds of millions of individuals within the United States and California.

116.  <u>Commonality</u>: There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual members of the Classes. These common questions of law and fact include, without limitation:

- The nature, scope, and operations of the wrongful practices of Defendants;

- Whether the Class Products are or have been represented as being made with "100% Natural Flavors," "All-Natural Flavors," or other substantially similar representations;

- Whether the Class Products contain citric acid;

- Whether the citric acid in any of the Class Products is derived from citrus fruits;

- •     Whether Defendants negligently or intentionally misrepresented or omitted the fact that the Class Products, including the Product purchased by Plaintiff and other members of the Classes, were sold illegally in the United States, including California;
- •     Whether Defendants knew or should have known that their business practices were unfair and/or unlawful;
- •     Whether Defendants' conduct violated the CLRA;
- •     Whether Defendants' conduct violated the FAL;
- •     Whether Defendants' conduct was "unlawful" as that term is defined in the UCL;
- •     Whether Defendants' conduct was "unfair" as that term is defined in the UCL;
- •     Whether Defendants' conduct was "fraudulent" as that term is defined in the UCL;
- •     Whether Defendants' conduct was "unfair, deceptive, untrue or misleading" as those terms are defined in the UCL;
- •     Whether Defendants were unjustly enriched by their unlawful, unfair and deceptive business practices;
- •     Whether Defendants breached an express warranty to Plaintiff and members of the Classes;
- •     Whether Defendants negligently or intentionally misrepresented their products;
- •     Whether Plaintiff and members of the Classes suffered monetary damages as a result of Defendants' conduct and, if so, the appropriate amount of damages; and
- •     Whether Plaintiff and members of the Classes are entitled to injunctive relief, including public injunctive relief.

117.  <u>Typicality</u>: Plaintiff's claims are typical of those of the Classes. Plaintiff and

all members of the Classes have been harmed by Defendants' wrongful practices. Plaintiff's claims arise from the same course of conduct that gave rise to the claims of the Classes and are based on the same legal theories. Specifically, Plaintiff purchased one or more of the Class Products that were labeled, represented and/or advertised as being made with "100% Natural Flavors," "All-Natural Flavors," or other similar claims.

118.  Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of members of the Classes. Plaintiff's counsel are competent and experienced in litigating consumer class actions. Plaintiff has retained counsel experienced in consumer protection law, including complex class action litigation involving unfair business practices. Plaintiff has no adverse or antagonistic interests to those of the Classes and will fairly and adequately protect the interests of the Classes.  Plaintiff's attorneys are aware of no interests adverse or antagonistic to those of Plaintiff and the proposed Classes.

119.  Predominance: Defendants have engaged in a common course of conduct toward Plaintiff and members of the Classes, in that Plaintiff and members of the Classes were induced to purchase the Class Products. The common issues arising from Defendants' conduct affecting members of the Classes set out above predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

120.  Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

121.  Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most members of the Classes would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

122.  The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to

individual members of the Classes, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each member of the Classes.

123.    Unless the Classes are certified, Defendants will retain monies received as a result of Defendant's unlawful, unfair and deceptive conduct alleged herein. Unless a class-wide injunction is issued, Defendants will also likely continue to advertise, market, label, promote and package the Class Products in an unlawful, unfair, deceptive and misleading manner, and members of the Classes will continue to be deceived, misled, harmed, and denied their rights under federal and California law.

124.    Defendants have acted on grounds that apply generally to the Classes, so that class certification is appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violations of the Consumer Legal Remedies Act ("CLRA")**
**(Cal. Civ. Code §§ 1750, *et seq*.)**
**(On Behalf of Plaintiff and the California Sub-Class)**

125.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

126.    California Civil Code Section 1750, *et seq.,* entitled the Consumer Legal Remedies Act ("CLRA"), enumerates various "unfair or deceptive" practices in a "transaction" relating to the sale of "goods" or "services" to a "consumer" that are illegal in the State of California.

127.    The Legislature's intent in promulgating the CLRA is expressed in Civil Code Section 1760, which provides, *inter alia,* that its terms are to be:

> Construed liberally and applied to promote its underlying
> purposes, which are to protect consumers against unfair

and deceptive business practices and to provide efficient and economical procedures to secure such protections.

128. Defendants' actions, representations, and conduct have violated, and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in the sale of beverage products to consumers.

129. Plaintiff and the members of the California Sub-Class are not sophisticated experts with independent knowledge of product labeling, marketing practices and/or ingredient sourcing.

130. Plaintiff and members of the California Sub-Class are consumers in California who purchased the Class Products for personal, family or household purposes.

131. Defendants are "person[s]" as defined by Cal. Civ. Code § 1761(c).

132. The Class Products constitute "goods" as defined in Cal. Civ. Code § 1761(a).

133. Plaintiff, and the members of the California Sub-Class, are each "consumer[s]" as defined in Cal. Civ. Code § 1761(d).

134. The purchases of Defendants' products by Plaintiff and the members of the California Sub-Class constituted a "transaction" as defined in Cal. Civ. Code § 1761(e).

135. Cal. Civ. Code § 1770(a)(2), (5), (7) and (9) of the CLRA provide that:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
> (2) [m]isrepresenting the source, sponsorship, approval, or certification of goods or services;
> (5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a

sponsorship, approval, status, affiliation, or connection which he or she does not have;

(7) [r]epresenting that goods or services are of a particular standard, quality, or grade…; [and]

(9) [a]dvertising goods or services with intent not to sell them as advertised.

136.  Defendants violated Civil Code section 1770(a)(2), (5), (7), and (9) by marketing and representing the Class Products as being made with "100% Natural Flavors," "All-Natural Flavors," and the like. In reality, the Class Products contain synthetically manufactured or otherwise non-natural flavoring ingredients, and were falsely, deceptively, and unlawfully labeled and marketed to conceal this fact.

137.  Plaintiff further alleges that the Defendants committed these acts with full awareness of the harm they would cause and engaged in such unfair and deceptive conduct despite this knowledge.

138.  Defendants knew or should have known that their representations about the Class Products, as described herein, violated numerous regulations and laws, including consumer protection laws, and that these statements would be relied upon by Plaintiff and members of the California Sub-Class.

139.  As a direct and proximate result of Defendants' violations of Cal. Civ. Code §§ 1750, *et seq*., Plaintiff and members of the California Sub-Class have suffered harm by paying for the Class Products, which they would not have purchased or would have purchased at a lower price had they known the products were unlawfully, falsely, unfairly, and deceptively labeled and/or marketed.

140.  Plaintiff and members of the California Sub-Class suffered monetary harm as a result of Defendants' conduct because: (a) they would not have purchased the Class Products on the same terms had it not been for Defendants' unlawful, unfair, and deceptive actions as set forth herein; and/or (b) they paid a price premium for the Class Products or chose them over competing products due to Defendants' joint marketing misrepresentations and deceptive labeling, as discussed herein.

141.   Plaintiff was therefore harmed because his money was taken by Defendants as a result of Defendants' false, unlawful, unfair, and deceptive misrepresentations regarding the Class Products. These unlawful actions include misrepresenting the nature of the flavoring ingredients used in the Class Products.

142.   Plaintiff and members of the California Sub-Class reasonably relied upon Defendants' representations regarding the Class Products, and Plaintiff and the members of the California Sub-Class reasonably expected that the Class Products would not be unlawfully labeled or marketed in a unfair, deceptive and misleading manner.

143.   Thus, Plaintiff and the members of the California Sub-Class reasonably relied to their detriment on Defendants' unlawful, unfair, deceptive and misleading representations.

144.   Pursuant to California Civil Code § 1782(a), on or about May 23, 2025, Plaintiff, through counsel, sent Defendants a notice and demand for corrective action (the "CLRA Demand") via certified mail, informing Defendants of their violations of the CLRA and demanding that they cease and desist from such violations, as well as make full restitution by refunding all monies received in connection therewith.

145.   If Defendants fail to respond to Plaintiff's CLRA Demand, fail to agree to rectify the problems associated with the conduct detailed above, or fail to give notice to all affected consumers within 30 days of the date of the CLRA Demand, Plaintiff reserves the right to amend the Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendants. As to this cause of action, at this time, Plaintiff seeks only restitution, injunctive relief, and declaratory relief.

146.   Plaintiff and members of the California Sub-Class were harmed as a direct and proximate result of Defendants' conduct because they paid a premium for "100%" and/or "all" naturally-flavored Class products even though the Class

Products they purchased were not in-fact 100% and/or all-naturally flavored as labeled.

147.    Attached hereto as **Exhibit A** is a sworn declaration from Plaintiff pursuant to Cal. Civ. Code § 1780(d).

## SECOND CAUSE OF ACTION
**Violations of California's Unfair Competition Law ("UCL")**
**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**
**(On Behalf of Plaintiff and the California Sub-Class)**

148.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

149.    Plaintiff brings this claim individually and on behalf of the members of the California Sub-Class for Defendants' violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

150.    Plaintiff and Defendants are each "person[s]" as defined by California Business & Professions Code § 17201.

151.    California Business & Professions Code § 17204 authorizes a private right of action on both an individual and representative basis.

152.    "Unfair competition" is defined by Business and Professions Code Section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising."

153.    The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

154.    Through the conduct alleged in detail above and herein, Defendants engaged in unlawful, unfair, deceptive and/or fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., during the four-year period preceding the filing of this Complaint, Cal. Bus. & Prof. Code § 17208, and persisting to this day.

## A. *"Unlawful" Prong*

155.   Defendants have committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Bus. & Prof. Code §§ 17200, *et seq.*

156.   Defendants violated federal and California law by falsely advertising, marketing, labeling, and selling the Class Products as being made with "100% Natural Flavors," "All-Natural Flavors" and the like, when they were not, while failing to disclose the true nature of the flavoring ingredients contained therein.

157.   Specifically, by manufacturing, distributing, and/or marketing the Class Products with false, unlawful, unfair and deceptive claims, Defendants violate the FDCA, 21 U.S.C. § 343(a); Cal. Health & Safety Code §§ 110390, 110395, 110398; California's CLRA, Civil Code § 1750, *et seq.*; and Californias' FAL, Cal. Bus. & Prof. Code § 17500, *et seq.*

158.   Defendants falsely, unlawfully, unfairly, and deceptively represents that the Class Products are made with "100% Natural Flavors," "All-Natural Flavors," and the like when, in fact, they are not. Instead, Defendants use synthetically manufactured or otherwise non-natural flavor ingredients to create the flavor profile for the Class Products.

159.   Aside from the unlawful conduct described herein, Defendants have other reasonably available alternatives to advance their business interests, such as accurately, truthfully, and lawfully marketing, labeling, and selling the Class Products.

160.   Instead, Defendants deliberately and deceptively misled consumers through unlawful and unfair practices for their own economic gain.

## B. *"Unfair" Prong*

161.   Defendants have engaged in acts of unfair competition prohibited by Bus. & Prof. Code § 17200, *et seq.*

162.   Defendants engaged in a pattern of "unfair" business practices that violate both the letter and the intent of the statutes and regulations cited above. Defendants' conduct threatens an incipient violation of the law or violates the policy and spirit of the law by manufacturing, distributing, and/or marketing their products with false, unfair and deceptive claims.

163.   The utility of such conduct, if any, is vastly outweighed by the harm it inflicts, particularly through the manufacturing, distribution, and/or marketing of the Class Products by means of false representations that they are made with "100% Natural Flavors," "All-Natural Flavors," and the like despite containing synthetically manufactured or otherwise non-natural flavoring ingredients.

164.   As a result of Defendants' conduct: (1) the injury to consumers was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was one that consumers could not have reasonably avoided.

165.   Without limitation, Defendants' knowing mislabeling and false, unlawful marketing of the Class Products constitute unlawful, unfair, and deceptive business practices, misleading consumers into believing they are purchasing products that contain only natural flavoring ingredients despite containing synthetically manufactured or otherwise non-natural flavoring ingredients.

166.   Plaintiff could not have reasonably avoided the resulting injury.

### C. *"Fraudulent" Prong*

167.   Defendants violated the "fraudulent" prong of the UCL by misleading Plaintiff and the members of the California Sub-Class to believe that the Class Products contain only natural flavoring ingredients.

168.   The Class Products are falsely labeled and marketed as being made with "100% Natural Flavors," "All-Natural Flavors," and the like despite Defendants' use of synthetically manufactured or otherwise non-natural flavoring ingredients in the Class Products. These misrepresentations mislead consumers, including

Plaintiff, into consuming synthetic flavoring ingredients to which they did not, and could not have, given informed consent.

169.    On or about March 16, 2025, while at his home in Granada Hills, California, Plaintiff came across Defendants' "7-Up®, 12 Oz, Case of 24" cans on Amazon (https://a.co/d/0n5HKoc).

170.    In reviewing images of the Product's Amazon webpage, Plaintiff noticed the words "100% Natural Flavors" displayed prominently in large, bold green letters encapsulated in a yellow banner on the Product's front label under the Product's 7-Up® logo. Plaintiff also noticed the same "100% Natural Flavors" representation on the front display panel of an image of the Product's can under the words "crisp-clean refreshing."

171.    Additionally, as Plaintiff scrolled through the same webpage, he noticed several other representations pertaining to the Product in bullet points under the "About this Item" section of the webpage, including the representation that "7UP soda is made with 100% natural flavors. Stripped of artificial flavors and preservatives."

172.    Relying on the above representations on the Product's Amazon webpage, Plaintiff decided to purchase the Product for $26.50, excluding shipping and taxes.

173.    Like Plaintiff, members of the California Sub-Class purchased the Class Products in reliance on Defendants' misrepresentations, which appeared on the Class Products' labeling and packaging, as well as in product descriptions on Defendants' Amazon listings and the websites of resellers.

174.    Plaintiff and members of the California Sub-Class are not sophisticated experts in beverage marketing practices, product labeling or ingredient sourcing, or the regulations governing the Class Products.

175.    Plaintiff and members of the California Sub-Class acted reasonably in purchasing the Class Products based on their incorrect belief that Defendants' representations that the Class Products contained "100% Natural Flavors," "All-

Natural Flavors," and other similar representations were accurate, truthful and lawful.

### D. *"Unfair, Deceptive, Untrue or Misleading Advertising" Prong*

176.    Defendants' labeling, marketing and advertising is unfair, deceptive, untrue, and misleading, as they mislead consumers into believing that the Class Products contain only natural flavoring ingredients, when in fact that is not true.

177.    Plaintiff, as a reasonable consumer, and the public are likely to be, and in fact were, deceived and misled by Defendants' labeling and marketing. They reasonably interpreted Defendants' representations according to their ordinary meaning—that the Class Products contain "*100%* Natural Flavors," "*All*-Natural Flavors," and the like, and do not contain synthetically manufactured or otherwise non-natural flavoring ingredients.

178.    Plaintiff and members of the California Sub-Class are not sophisticated experts in beverage marketing practices, product labeling, ingredient sourcing, or the regulations governing the Class Products. They acted reasonably in purchasing the Class Products based on their belief that Defendants' representations were accurate, truthful and lawful.

179.    Plaintiff and members of the California Sub-Class lost money or property as a result of Defendants' UCL violations because, at a minimum: (a) they would not have purchased the Class Products on the same terms had they known the true facts about Defendants' representations; (b) they paid a price premium for the Class Products due to Defendants' alleged misrepresentations; and/or (c) they chose Class Products over the products of Defendants' competitors who made accurate, truthful and lawful representations about their products.

180.    Defendants' alleged unlawful, unfair, and deceptive business practices, along with their unfair, deceptive, untrue, or misleading advertising, present a continuing threat to the public as Defendants continue to engage in unlawful conduct that harms consumers.

181.   Such acts and omissions by Defendants are unlawful, unfair, and/or deceptive, constituting violations of Business & Professions Code §§ 17200, *et seq*.

182.   As a direct and proximate result of the acts and representations described above, Defendants have received and continue to receive unearned commercial benefits at the expense of their competitors and the public.

183.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct described herein, Defendants have been, and will continue to be, enriched by ill-gotten gains from customers, including Plaintiff, who unwittingly provided money based on Defendants' "100% Natural Flavors," "All-Natural Flavors," and other similar misrepresentations.

184.   Plaintiff was harmed because Defendants took Plaintiff's money through an unlawful, false, unfair, and deceptive representation made regarding the Class Products.

185.   The conduct of Defendants, as described above, demonstrates the need for injunctive relief to restrain such acts of unfair competition pursuant to California Business and Professions Code. Unless enjoined by the court, Defendants will retain the ability to, and may, continue engaging in unfair and deceptive competition and misleading marketing. As a result, Plaintiff and the members of the California Sub-Class are entitled to both injunctive and monetary relief.

186.   Plaintiff would like to purchase at least some of the Class Products again but cannot be certain he will not be misled in the future unless and until Defendants make the appropriate changes to the labeling and marketing of their Class Products, as requested herein.

187.   Pursuant to Bus. and Prof. Code § 17203, Plaintiff and members of the California Sub-Class are entitled to, and hereby seek, injunctive relief to prevent Defendants from continuing the conduct in question as well as restitution of Defendants' ill-gotten gains.

188.  Plaintiff also seeks public injunctive relief to prevent Defendants from marketing and selling the Class Products as being made with "100% Natural Flavors," "All-Natural Flavors," and the like, despite the inclusion of synthetically manufactured or otherwise non-natural flavoring ingredients, including the removal of the misrepresented Class Products from the marketplace as well as removal of the misrepresentations on retailers' websites.

189.  In prosecuting this action to enforce important rights affecting the public interest, Plaintiff seeks the recovery of attorneys' fees and costs pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

190.  As it concerns this Second Cause of Action, Plaintiff seeks restitution in the alternative to monetary damages. Plaintiff also seeks prospective injunctive relief.

### THIRD CAUSE OF ACTION
**Violations of California's False Advertising Law ("FAL")**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq*.)**
**(On Behalf of Plaintiff and the California Sub-Class)**

191.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

192.  California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, states that "[i]t is unlawful for any ... corporation ... with intent … to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement...which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

193.  Defendants' material misrepresentations and omissions concerning the nature of the flavoring ingredients used in their Class Products, as alleged herein,

violate Bus. & Prof. Code §§ 17500, *et seq*. Defendants knew or should have known that their misrepresentations and omissions were false, unlawful, unfair, deceptive, and misleading. This includes the representations that the Class Products contain "100% Natural Flavors," "All-Natural Flavors," and the like, despite containing synthetically manufactured or otherwise non-natural flavoring ingredients.

194.   Plaintiff and the California Sub-Class suffered tangible, concrete injuries as a result of Defendants' actions, as set forth herein, because they purchased the Class Products in reliance on Defendants' misrepresentations.

195.   As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff and members of the California Sub-Class are entitled to injunctive relief, equitable relief, and restitution.

196.   Further, Plaintiff and members of the California Sub-Class seek an order requiring Defendants to disclose the misrepresentations and request an order awarding Plaintiff restitution for the money wrongfully acquired by Defendants through those misrepresentations.

197.   Additionally, Plaintiff and members of the California Sub-Class seek an order requiring Defendants to pay attorneys' fees pursuant to, *inter alia*, Cal. Civ. Proc. Code § 1021.5.

198.   As it concerns this Third Cause of Action, Plaintiff seeks restitution in the alternative to monetary damages. Plaintiff also seeks prospective injunctive relief.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty
### (On Behalf of Plaintiff, the National Class, and the California Sub-Class)

199.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

200.   Under California law, the elements of breach of express warranty include the seller's statement(s) constituting an affirmation of fact or promise or a description of the goods which is made part of the basis of the bargain, and breach of that

warranty. Reliance is not required. *See Weinstat v. Dentsply Internat., Inc.*, 180 Cal.App.4th 1213, 1227 (2010).

201.  Defendants jointly represented to Plaintiff and similarly situated consumers, through their labeling, advertising, and marketing, that the Class Products are made with "100% Natural Flavors," "All-Natural Flavors," and the like, when, in fact, they are not. Instead the Class Products are also flavored with synthetically manufactured, artificial, or otherwise non-natural ingredients.

202.  Defendants' representations regarding the flavoring of the Class Products constitute affirmations of fact.

203.  Defendants' explicit claim that the Class Products contain "100% Natural Flavors," "All-Natural Flavors," and the like, directly pertains to the nature and composition of the products. This representation forms a fundamental part of the bargain between Defendants and purchasers, influencing consumer purchasing decisions and expectations.

204.  Defendants' statements—prominently featured on the labeling and marketing of the Class Products constitutes an express warranty concerning the nature, composition, and origin of the products' flavoring ingredients.

205.  Defendants breached the express warranty by falsely representing that the Class Products are made with "100% Natural Flavors," "All-Natural Flavors," and the like, when, in reality, they contained synthetically manufactured, artificial, or otherwise non-natural flavoring ingredients.

206.  As a result of Defendants' breach, Plaintiff and members of the Classes suffered harm and are entitled to recover either the full purchase price of the Class Products or the difference between their actual value and the value they would have held if Defendants' representations regarding the Class Products had been accurate, truthful, and lawful.

207.  Plaintiff and members of the Classes did not receive the benefit of their bargain and sustained additional injuries, as alleged herein.

208.   Had Plaintiff and members of the Classes known the true nature of the Class Products, they either would not have purchased the products or would not have paid the price Defendants charged.

209.   Defendants' misrepresentations were a substantial factor in causing Plaintiff and the Classes economic harm.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff, the National Class, and the California Sub-Class)

210.   Plaintiff pleads this unjust enrichment cause of action in the alternative to contract-based claims.

211.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein, with the exception of contract-based claims, and further alleges as follows:

212.   Under California law, the elements of unjust enrichment are the receipt of a benefit and the unjust retention of that benefit at the expense of another.

213.   Plaintiff and members of the Classes conferred non-gratuitous benefits upon Defendants by purchasing the Class Products, which Defendants misrepresented as to their flavoring ingredients' "natural" status.

214.   Plaintiff and members of the Classes allege that Defendants owe them money for the unjust conduct described herein that resulted in the wrongful acquisition of funds.

215.   An undue advantage was taken of Plaintiff's and the members of the Classes' lack of knowledge of the deception, resulting in money being extracted to which Defendants had no legal right.

216.   Defendants are therefore indebted to Plaintiff and members of the Classes in a specific sum—the amount of money each paid for the Class Products, which Defendants should not retain in equity and good conscience.

217.   Defendants are therefore liable to Plaintiff and members of the Classes for the amount of unjust enrichment.

218.   Defendants' retention of any benefit, whether directly or indirectly collected from Plaintiff and members of the Classes, violates principles of justice, equity, and good conscience.

219.   As a result, Defendants have been and continue to be unjustly enriched.

220.   Plaintiff and the Classes are entitled to recover from Defendants all amounts that Defendants have wrongfully and improperly obtained, and Defendants should be required to disgorge to Plaintiff and members of the Classes the benefits they have unjustly received.

221.   Defendants accepted and retained such benefits with knowledge that Plaintiff's and the Classes' rights were being violated for financial gain. Defendants have been unjustly enriched by retaining the revenues and profits obtained from Plaintiff and members of the Classes, and such retention under these circumstances is both unjust and inequitable.

222.   As a direct and proximate result of Defendants' unlawful practices and the retention of monies paid by Plaintiff and members of the Classes, Plaintiff and the members of the Classes have suffered concrete harm and injury.

223.   Defendants' retention of the non-gratuitous benefits conferred upon them by Plaintiff and members of the Classes would be unjust and inequitable.

224.   Plaintiff and members of the Classes are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendants, in a manner to be determined by this Court.

### SIXTH CAUSE OF ACTION
**Negligent Misrepresentation**
**(On Behalf of Plaintiff, the National Class, and the California Sub-Class)**

225.   Plaintiff pleads this negligent misrepresentation cause of action in the alternative to the intentional misrepresentation cause of action stated below.

226.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

227.   Under California law, the elements of negligent misrepresentation are a misrepresentation of a past or existing material fact without reasonable grounds for believing it to be true, with intent to induce reliance on the fact misrepresented, intent by the defendant that the plaintiff rely on the representation, justifiable reliance by the plaintiff, and damages.

228.   Defendants represented to the public, including Plaintiff and the Classes, through their marketing, advertising, labeling, and other means, that the Class Products are made with "100% Natural Flavors," "All-Natural Flavors," and the like. This representation is false and misleading because the Class Products contain synthetically manufactured, artificial, or otherwise non-natural flavoring ingredients.

229.   Defendants had no reasonable grounds to believe that their "100% Natural Flavors," "All-Natural Flavors," and other substantially similar representations were true when they made such representations because they are uniquely aware of the ingredients they put in their Class Products.

230.   Plaintiff alleges that Defendants made these negligent, false and deceptive representations with the intent to induce the public, including Plaintiff and the members of the Classes, to purchase the Class Products.

231.   Plaintiff and other similarly situated individuals saw, believed, and reasonably relied upon Defendants' negligent, false, unfair, and deceptive misrepresentations, and purchased the Class Products as a result of this reliance.

232.   At all relevant times, Defendants made the negligent, false, unfair, and deceptive misrepresentations alleged herein, knowing or reasonably having known that such representations were unlawful, unfair, deceptive, inaccurate, and misleading.

233.   As a direct and proximate result of Defendants' negligent, false, unfair, and deceptive misrepresentations, Plaintiff and similarly situated consumers were induced to purchase the Class Products, purchase more of them, pay a higher price, or choose them over competitors' products.

234.   Defendants' unlawful, unfair, and deceptive acts caused damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Intentional Misrepresentation
**(On Behalf of Plaintiff, the National Class, and the California Sub-Class)**

235.   Plaintiff pleads this intentional misrepresentation cause of action in the alternative to the negligent misrepresentation cause of action stated above.

236.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein, and further alleges as follows:

237.   Under California law, the elements of intentional misrepresentation are a false representation of a material fact, knowledge by the defendant that the representation was false or reckless disregard for its truth, intent by the defendant to induce reliance, justifiable reliance by the plaintiff, and damages.

238.   Defendants knowingly and intentionally represented to the public, including Plaintiff and the Classes, through their marketing, advertising, labeling, and other means, that the Class Products are made with "100% Natural Flavors," "All-Natural Flavors," and the like. This representation is false and misleading because the Class Products contain synthetically manufactured or otherwise non-natural flavoring ingredients.

239.   Defendants knew the representations were false because they maintain full and collective control over the labeling, sourcing, formulation and manufacturing of the Class Products, including the sourcing of their flavoring ingredients.

240.   Defendants acted intentionally by willfully and purposefully disseminating misrepresentations about the Class Products through labeling, online and offline marketing, advertising, and social media.

241.   However, as described above, Defendants' representations regarding the Class Products are false, unlawful, unfair, deceptive and/or misleading.

242.   Defendants knew that their representations regarding the Class Products were false, unlawful, unfair, deceptive, and/or misleading, yet continued to make such representations over a period of years.

243.   Defendants further knew that retailers were marketing the Class Products in a false or misleading manner, as Defendants jointly designed, manufactured, and affixed the product labeling to the Class Products before supplying them to retailers. Additionally, Defendants provided retailers with marketing materials that contained their false and misleading representations, thereby perpetuating the deception.

244.   Plaintiff and members of the Classes saw, believed, and relied on Defendant's misrepresentations when deciding to purchase the Class Products.

245.   As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiff and members of the Classes suffered damages in an amount to be determined at trial.

246.   By engaging in the acts described above, Plaintiff and members of the Classes are entitled to recover exemplary or punitive damages.

## PRAYER FOR RELIEF

247.   WHEREFORE, Plaintiff prays for relief and judgment against Defendants, and each of them, as follows, seeking restitution and disgorgement in the alternative to legal relief where applicable, as well as prospective injunctive relief:

- Certification of this action as a class action;
- Appointment of Plaintiff as Class Representative;
- Appointment of Plaintiff's attorneys as Class Counsel;

- That Defendants' wrongful conduct alleged herein be adjudged and decreed to violate the consumer protection statutes asserted herein;

- An Order declaring that Defendants' conduct violated the CLRA, California Civil Code §§ 1750, *et seq.*, and awarding injunctive relief pursuant to Cal. Civ. Code §§ 1780(a) and (b);

- An Order declaring that Defendants' conduct violated California's Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*; and awarding injunctive relief pursuant to Bus. & Prof. Code § 17203;

- An Order requiring Defendants to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

- An Order requiring the imposition of a constructive trust and/or disgorgement of Defendants' ill-gotten gains, compelling Defendants to pay restitution to Plaintiff and all members of the Classes, and to restore to Plaintiff and the Classes all funds acquired through any act or practice declared by this Court to be unlawful, fraudulent, unfair, or deceptive; in violation of laws, statutes, or regulations; or constituting unfair competition, along with pre- and post-judgment interest thereon;

- For pre and post-judgment interest on all amounts awarded;

- For an order of restitution and all other forms of equitable monetary relief, as pleaded, including awarding such relief pursuant to Bus. & Prof. Code § 17535; and/or Bus. & Prof. Code § 17203;

- For public injunctive relief as pleaded or as the Court may deem proper;

- That Defendants be enjoined from continuing the wrongful conduct alleged herein and required to comply with all applicable laws;

- Punitive damages including under Cal. Civ. Code § 3294;

- General and compensatory damages in an amount to be determined at trial;

- That Plaintiff recover his costs of suit, including reasonable attorneys' fees and expenses pursuant to, *inter alia*, Cal. Civ. Code. § 1021.5; and

- That Plaintiff and members of the Classes be granted any other relief the Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

248.  Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: May 27, 2025                              Respectfully submitted,

                                                 **KAZEROUNI LAW GROUP, APC**

                                                 By:  _/s/ Abbas Kazerounian_____
                                                      Abbas Kazerounian, Esq.
                                                      *ATTORNEYS FOR PLAINTIFF*

**Additional Plaintiff's Counsel**
**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**KAZEROUNI LAW GROUP, APC**
Gil Melili, Esq. (SBN: 337116)
gil@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523