PERLETTE JURA, SBN 242332
pjura@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

[Additional Counsel on Signature Page]

Attorney for Defendants,

DR PEPPER/SEVEN UP, INC.
and KEURIG DR PEPPER INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANT JOUKJIAN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>DR PEPPER/SEVEN UP, INC.; and KEURIG DR PEPPER INC.,<br><br>    Defendants. | CASE NO. 2:25-cv-04771-MRA-JCx<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MOTION TO STRIKE CLASS ALLEGATIONS**<br><br>Hearing Date:  November 24, 2025<br><br>Hearing Time: 1:30 p.m.<br><br>Courtroom: 9B<br><br>Hon. Monica Ramirez Almadani<br><br>Amended Complaint Filed:  August 14, 2025 |

**TO THE HONORABLE COURT, PLAINTIFF, AND HIS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 24, 2025, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 9B at 411 W. Fourth Street, Santa Ana, CA 92701, before the Honorable Mónica Ramírez Almadani, Defendants Dr Pepper/Seven Up, Inc and Keurig Dr Pepper Inc. will, and hereby do, move the Court for an order dismissing with prejudice in its entirety Plaintiff Shant Joukjian's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis that the First Amended Complaint fails to state a plausible claim upon which relief can be granted. In the event any claims survive, however, Defendants move the Court for an order striking Plaintiff's nationwide class allegations on the basis that Plaintiff lacks standing to assert nationwide class claims.

This Motion is made following a meet-and-confer conference of Defendants' and Plaintiff's counsel pursuant to Local Rule 7-3, which took place on August 8, 2025. The parties engaged in additional discussion on August 22, 2025, and September 5, 2025.

DATED: September 5, 2025

GIBSON, DUNN & CRUTCHER LLP

By:   /s/ *Perlette Jura*
       Perlette Jura

PERLETTE JURA, SBN 242332
pjura@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

JASON MELTZER (*pro hac vice*)
jmeltzer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street
Washington, D.C 20036

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MOTION TO STRIKE

1                 Telephone: 202.955.8500

2                 Facsimile: 202.467.0539

3                 RUSS FALCONER (*pro hac vice*)

4                 rfalconer@gibsondunn.com

                  GIBSON, DUNN & CRUTCHER LLP

5                 2001 Ross Avenue Suite 2100

6                 Dallas, Texas 75201

                  Telephone: 214.698.3100

7                 Facsimile: 214.571.2900

8

9                 *Attorneys for Defendants*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MOTION TO STRIKE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD ON MOTION TO DISMISS ....................................... 3

ARGUMENT ....................................................................................................... 3

    I.     The Court Should Dismiss Plaintiff's Claims ............................................ 3

          A.     The statements on the third-party websites are true: 7-Up®
                contains no artificial flavors. ............................................................ 4

                1.     The facts alleged in the complaint affirmatively
                        establish that both forms of citric acid are consistent
                        with the FDA's "natural flavor" definition. .......................... 4

                2.     The complaint does not allege that the other
                        challenged ingredients are "flavors" as the FDA
                        defines that term. ..................................................................... 6

          B.     The FDCA's preemption provision bars Plaintiff from
                arguing that 7-Up® contains artificial flavors. ............................. 10

    II.    The Court Should Strike Plaintiff's Nationwide Class
         Allegations ................................................................................................ 11

V.  CONCLUSION ................................................................................................ 13

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008) ........................................................................................... 10

*Am. Meat Inst. v. Leeman*,
   180 Cal. App. 4th 728 (2009) ........................................................................... 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................... 3

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005) ......................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................... 3

*Carvalho v. Equifax Info. Servs., LLC*,
   629 F.3d 876 (9th Cir. 2010) ............................................................................. 3

*Cohen v. ConAgra Brands, Inc.*,
   16 F.4th 1283 (9th Cir. 2021) .......................................................................... 11

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ......................................................................................... 10

*Dvora v. Gen. Mills, Inc.*,
   2011 WL 1897349 (C.D. Cal. May 16, 2011) .............................................. 4, 11

*Fraker v. KFC Corp.*,
   2007 WL 1296571 (S.D. Cal. Apr. 30, 2007) .................................................... 4

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ......................................................................................... 12

*In re Glumetza Antitrust Litig.*,
   2020 WL 1066934 (N.D. Cal. Mar. 5, 2020) .................................................. 12

*Hindsman v. Gen. Motors LLC*,
   2018 WL 2463113 (N.D. Cal. June 1, 2018) ................................................... 13

*Ivie v. Kraft Foods Glob., Inc.*,
   961 F. Supp. 2d 1033 (N.D. Cal. 2013) ....................................................... 9, 10

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ............................................................................. 3

*Meaunrit v. ConAgra Foods Inc.*,
   2010 WL 2867393 (N.D. Cal. July 20, 2010) .................................................. 11

*Min Sook Shin v. Umeken USA, Inc.*,
   773 F. App'x 373 (9th Cir. 2019) ................................................................... 4, 9

ii

*Moore v. Trader Joe's Co.*,
   4 F.4th 874 (9th Cir. 2021) ..................................................................................... 3

*Moorer v. StemGenex Med. Grp., Inc.*,
   830 F. App'x 218 (9th Cir. 2020) ......................................................................... 13

*Reid v. Johnson & Johnson*,
   780 F.3d 952 (9th Cir. 2015) ............................................................................ 4, 10

*Rosen v. Tenne. Com'r of Fin. & Admin.*,
   288 F.3d 918 (6th Cir. 2002) ................................................................................. 8

*Sanders v. Apple Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ................................................................ 12

*Schertzer v. Bank of Am., N.A.*,
   445 F. Supp. 3d 1058 (S.D. Cal. 2020) .............................................................. 12

*Simpson v. California Pizza Kitchen, Inc.*,
   989 F. Supp. 2d 1015 (S.D. Cal. 2013) .............................................................. 10

*Soo v. Lorex Corp.*,
   2020 WL 5408117 (N.D. Cal. Sept. 9, 2020) ................................................ 12, 13

*Sponchiado v. Apple, Inc.*,
   2019 WL 6117482 (N.D. Cal. Nov. 18, 2019) ................................................... 12

*Stewart v. Kodiak Cakes, LLC*,
   537 F. Supp. 3d 1103 (S.D. Cal. 2021) .............................................................. 12

*Taylor AG Indus. v. Pure-Gro*,
   54 F.3d 555 (9th Cir. 1995) ................................................................................. 11

*Torres v. Wells Fargo Bank*,
   2018 WL 6137126 (C.D. Cal. Aug. 28, 2018) ................................................... 12

*Turek v. Gen. Mills, Inc.*,
   662 F.3d 423 (7th Cir. 2011) ............................................................................... 10

*United States v. 119 Cases, More or Less, New Dextra Brand Fortified*
   *Cane Sugar*,
   231 F. Supp. 551 (S.D. Fla. 1963) ........................................................................ 5

*United States v. U.S. Sugar Corp.*,
   2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d
   Cir. 2023) .............................................................................................................. 5

*Van Mourik v. Big Heart Pet Brands, Inc.*,
   2018 WL 1116715 (N.D. Cal. Mar. 1, 2018) ..................................................... 12

*Viggiano v. Hansen Nat. Corp.*,
   944 F. Supp. 2d 877 (C.D. Cal. 2013) ....................................................... 6, 7, 8, 9

*Webb v. Trader Joe's Co.*,
   999 F.3d 1196 (9th Cir. 2021) ............................................................................... 3

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MOTION TO
STRIKE

**Statutes**

21 U.S.C. § 321(m)............................................................................................4, 11

21 U.S.C. § 341......................................................................................................4

21 U.S.C. § 343(i)..................................................................................................9

21 U.S.C. § 343-1(a)(2).......................................................................................10

21 U.S.C. § 343-1(a)(3).......................................................................................10

Cal. Health & Safety Code § 110100(a)................................................................4

**Other Authorities**

B. Max, *Biotechnological Production of Citric Acid*, 41 BRAZ. J. OF
    MICROBIOLOGY 862 (2010) ...........................................................................9

Sabrina Mores et al., *Citric Acid Bioproduction and Downstream
    Processing: Status, Opportunities, and Challenges*, 320 BIORESOURCE
    TECH., 320 (2021)............................................................................................9

Xitrical, *Application of Potassium Citrate in Beverages and Formulation
    Optimization* (July 3, 2024) https://www.xitrical.com/application-of-
    potassium-citrate-in-beverages-and-formulation-optimization/...................9

**Regulations**

21 C.F.R. § 101.1 *et seq.*.......................................................................................4

21 C.F.R. § 101.22.............................................................................................5, 6

21 C.F.R. § 170.3...........................................................................................6, 7, 8

21 C.F.R. § 172.515(b)..........................................................................................9

21 C.F.R. § 182.60.................................................................................................9

Gibson, Dunn &
Crutcher LLP

# INTRODUCTION

Plaintiff's original complaint in this case challenged 7-Up® product labels. *See* ECF No. 1. But after Defendants told Plaintiff that none of the labels during the relevant time period actually featured the statements he was challenging, he backtracked and filed an amended complaint dropping reference to the product labels. ECF No. 17. Now, Plaintiff claims in his amended complaint that 7-Up® is inaccurately marketed—on certain third-party websites only—as containing "100% Natural Flavors" and "All-Natural Flavors" because it contains a handful of ingredients—citric acid, potassium citrate, calcium disodium EDTA, and two artificial sweeteners—that he incorrectly asserts are artificial flavors. The amended complaint continues to fail to state a claim, and this Court should dismiss Plaintiff's claims with prejudice.

The fatal flaw in the complaint is simple: It is neither false nor misleading to describe 7-Up® products as containing "100% Natural Flavors" or "All-Natural Flavors." Those descriptions are true. The Food and Drug Administration has promulgated a detailed set of regulations that (A) dictate what kinds of ingredients in a beverage can be labeled "natural flavors" and (B) differentiate between ingredients that function as "flavors" and ingredients that function as "flavor enhancers." The facts pleaded in the complaint establish that the citric acid in 7-Up® is consistent with a "natural flavors" statement and is not an "artificial flavor." And the complaint fails to plausibly allege that any of the challenged ingredients is a "flavor." Rather, the allegations reflect that each of them is a flavor enhancer.

The fact that the "100% Natural Flavors" or "All-Natural Flavors" descriptions are accurate under federal law requires dismissal of all of Plaintiff's claims. Plaintiff cannot argue that the statements are misleading under California law notwithstanding their compliance with federal law. California has, by statute, adopted the FDA's definitions as its own. And even if it hadn't, the Federal Food, Drug, and Cosmetic Act would preempt any attempt to impose different requirements under state law.

Should any of Plaintiff's claims survive, this Court should strike Plaintiff's

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MOTION TO STRIKE

nationwide class allegations, as Plaintiff lacks standing to pursue class claims under the laws of states other than California.

## BACKGROUND

In March 2025, Plaintiff Shant Joukjian allegedly "searched online for beverages made with natural flavors" and found 7-Up® available for sale on Amazon. ECF No. 17 ("FAC") ¶¶ 87–88. While on Amazon's website, Plaintiff purports to have seen an image of the product and a description on the webpage stating "100% Natural Flavors." *Id.* ¶ 89. Plaintiff asserts that the product description on Amazon's website also stated that the product was "[s]tripped of artificial flavors and preservatives." *Id.* ¶ 90. Plaintiff asserts that "with the intent to purchase a beverage free from synthetic flavoring ingredients, [he] purchased a 24-can pack" for $26.50. *Id.* ¶ 89. The 7-Up® Plaintiff purchased contains citric acid, potassium citrate, and calcium disodium EDTA. *Id.* ¶ 90. Notably, Plaintiff now admits that the specific product he purchased "did not bear the '100% Natural Flavors' representation on the cans or packaging received by Plaintiff." *Id.* ¶ 44.

About two months later, Plaintiff sued Dr Pepper/Seven Up, Inc. and Keurig Dr Pepper Inc. on behalf of putative nationwide and California classes of purchasers of several varieties of 7-Up® based on his single purchase of one variety of 7-Up®. ECF No. 1 ("Compl.") ¶¶ 1, 16, 110, 111. Although the product Plaintiff purchased did not contain the challenged statements on the can or packaging, his original complaint challenged the labels as misleading. *See, e.g.*, Compl. ¶¶ 10, 14. Following the parties' conferral on Defendants' anticipated motion to dismiss the original complaint, Plaintiff dropped his labeling claims. FAC ¶¶ 10, 14. Plaintiff, however, declined to address the other pleading failures Defendants identified during that conferral in his amended complaint, including the grounds raised in this motion.

Plaintiff asserts claims under California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"); False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* ("FAL"); and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

1  *et seq.* ("UCL").  FAC ¶¶ 125–98.  Plaintiff also brings claims for breach of warranty,
2  unjust enrichment, and negligent and intentional misrepresentation.  *Id.* ¶¶ 199–246.

### LEGAL STANDARD ON MOTION TO DISMISS

4      Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that
5  does not "contain sufficient factual matter . . . to 'state a claim to relief that is plausible
6  on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*
7  *Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of
8  action, supported by mere conclusory statements, do not suffice"; rather, the plaintiff
9  bears the burden of pleading *facts* "that allow[] the court to draw the reasonable
10 inference that the defendant is liable for the misconduct alleged."  *Id.* at 678–79.

11     A district court may dismiss a complaint with prejudice if amendment would be
12 "futile."  *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010).
13 The Ninth Circuit routinely affirms dismissal with prejudice on the grounds that
14 "amendment would be futile" where a plaintiff's claims are preempted or the plaintiff
15 has not alleged a plausible theory of deception in an alleged false-advertising case.  *E.g.*,
16 *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1204–05 (9th Cir. 2021) (finding that the
17 "district court did not err in dismissing . . . claims with prejudice" because the plaintiff
18 "cannot amend her complaint to avoid preemption"); *Moore v. Trader Joe's Co.*, 4 F.4th
19 874, 886 (9th Cir. 2021) (affirming dismissal with prejudice where plaintiffs could not
20 allege facts to state a plausible claim).

21     Dismissal with prejudice is also appropriate where a party has already had an
22 opportunity to amend their complaint, but failed to correct previously identified pleading
23 deficiencies.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 809–10 (9th Cir. 1988)
24 (holding that the district court did not abuse its discretion in denying plaintiffs leave to
25 file a second amended complaint where they had previously failed to cure deficiencies).

### ARGUMENT

27 **I.  The Court Should Dismiss Plaintiff's Claims**
28     All of Plaintiff's claims fail for the most fundamental of reasons:  7-Up® contains

1   no artificial flavors.  Because of that, statements on third-party websites that 7-Up®
2   contains "all-natural flavors" or "100% natural flavors" are true and not misleading.

3   **A. The statements on the third-party websites are true: 7-Up® contains no**
4   **artificial flavors.**

5   To determine whether any of 7-Up®'s ingredients is an "artificial flavor," the
6   Court looks to federal law—specifically, regulations promulgated under the Federal
7   Food, Drug, and Cosmetic Act.  Enacted in 1938, the FDCA, 21 U.S.C. § 301 *et seq.*,
8   "presents a comprehensive regulatory scheme of branding and labeling of food
9   products." *Fraker v. KFC Corp.*, 2007 WL 1296571, at *4 (S.D. Cal. Apr. 30, 2007).
10  In 1990, Congress passed the Nutritional Labeling and Education Act ("NLEA"), which
11  amended the FDCA to "establish[] uniform food labeling requirements." *Reid v.*
12  *Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015).  For purposes of the FDCA,
13  "labeling" includes not just the label on an article of food or drink, but all "written,
14  printed, or graphic matter . . . accompanying such article." 21 U.S.C. § 321(m).

15  The FDCA empowers the Food and Drug Administration to promulgate
16  regulations defining the terms used on food labels.  21 U.S.C. § 341.  The FDA has
17  "implemented a comprehensive scheme governing the labeling of flavors and flavorings
18  in food products." *Dvora v. Gen. Mills, Inc.*, 2011 WL 1897349, at *4 (C.D. Cal. May
19  16, 2011); *see* 21 C.F.R. § 101.1 *et seq.*  California's Sherman Food, Drug and Cosmetic
20  Law expressly adopts and incorporates the FDA's labeling regulations, making those
21  regulations binding as a matter of California law. *Min Sook Shin v. Umeken USA, Inc.*,
22  773 F. App'x 373, 375 n.1 (9th Cir. 2019) (citing Cal. Health & Safety Code §
23  110100(a)).

24  FDA regulations thus supply the definitive answer to the question whether an
25  ingredient in a beverage is an "artificial flavor."  Here, those regulations unambiguously
26  establish that none of the ingredients Plaintiff challenges is an "artificial flavor."

27  **1. The facts alleged in the complaint affirmatively establish that both forms**
28  **of citric acid are consistent with the FDA's "natural flavor" definition.**

1    The complaint does not plausibly allege that the citric acid in 7-Up® is artificial—

2    in fact, it alleges the opposite.  Under FDA regulations, an ingredient is considered an

3    "artificial flavor" only if (a) its "function . . . is to impart flavor" and (b) it is not natural

4    (i.e., it is not derived from a natural source).  21 C.F.R. § 101.22(a)(1).

5    Citric acid cannot be an artificial flavor because both forms of citric acid meet the

6    "natural" part of FDA's definition of "natural flavor."  Under the FDA's definition of

7    "natural flavor," a flavor is natural if it is an "extractive," "distillate," or "product of

8    . . . enzymolysis" that contains flavoring constituents "derived from" a "fruit or fruit

9    juice, vegetable or vegetable juice, . . . or similar plant material."  *Id.* § 101.22(a)(3).

10    The facts alleged in the complaint demonstrate that both forms of citric acid fall

11    within this definition.  The complaint admits that "citric acid can be naturally derived

12    from citric fruits."  FAC ¶ 60.  The complaint asserts that the citric acid in 7-Up® is not

13    natural because the mass-produced form of citric acid (which the complaint refers to as

14    MCA) is "industrially synthesized through a process involving genetically mutated mold

15    (*Aspergillus niger*)."  *Id.*  But in fact, the synthesis process the complaint describes

16    involves extracting MCA from plant material.

17    Specifically, paragraphs 63, 64, and 65 allege that MCA is derived from sugar.

18    *See* FAC ¶ 63 ("industrial synthesis of MCA involves introducing a sucrose- or glucose-

19    containing medium" to *Aspergillus niger*, which "metabolizes the sugars"); *id.* ¶ 64

20    (citric acid is synthesized from "the sugar medium"); *id.* ¶ 65 ("the mutated *Aspergillus*

21    *niger* metabolizes the sugar medium").

22    Sugar is a "plant material" within the meaning of 21 C.F.R. § 101.22(a)(3).  *See,*

23    *e.g.*, *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *3 (D. Del. Sept. 28, 2022)

24    (sugar "is produced by refining sugar cane or processing sugar beets"), *aff'd*, 73 F.4th

25    197 (3d Cir. 2023); *United States v. 119 Cases, More or Less, New Dextra Brand*

26    *Fortified Cane Sugar*, 231 F. Supp. 551, 554 (S.D. Fla. 1963) ("Sugar in its natural state

27    is found in sugar cane and sugar beet plants.").

28

Thus, even taking as true the complaint's allegation that there is MCA in 7-Up®, the complaint's allegation that MCA is the product of *Aspergillus niger* metabolizing sugar establishes that MCA is derived from a plant material and therefore is "natural" under the FDA's definition of a "natural flavor" in 21 C.F.R. § 101.22(a)(3).

### 2. The complaint does not allege that the other challenged ingredients are "flavors" as the FDA defines that term.

The remaining portions of Plaintiff's claim fail because the complaint does not allege that any of the other challenged ingredients in 7-Up® are flavors.

The FDA's regulations draw a foundational distinction between *flavors* and *flavor enhancers*.

- Flavors are "[s]ubstances added to impart . . . a taste or aroma in food." 21 C.F.R. § 170.3(o)(12). Flavors "give the product an original taste." *Viggiano v. Hansen Nat. Corp.*, 944 F. Supp. 2d 877, 889 (C.D. Cal. 2013).[1]

- By contrast, "flavor enhancers" are "[s]ubstances added to supplement, enhance, or modify the original taste and/or aroma of a food, *without imparting a characteristic taste or aroma of [their] own*." 21 C.F.R. § 170.3(o)(11) (emphasis added). Flavor enhancers "sweeten or amplify whatever characterizing flavor [the product] has from another source." *Viggiano*, 944 F. Supp. 2d at 889.

An ingredient that is a flavor enhancer is, "[b]y definition," not a flavor. *See Viggiano*, 944 F. Supp. 2d at 889.

---

[1] When the label of a food product "makes any direct or indirect representations with respect to [its] primary recognizable flavor(s)," that flavor is considered the "characterizing flavor." 21 C.F.R. § 101.22(i). So lemon/lime would be the characterizing flavor of most 7-Up® products, and cherry would be the characterizing flavor of 7-Up® Cherry. "Natural Flavors" statements are expressly permitted under FDA regulations when the characterizing lemon, lime, and cherry flavors are derived from lemons, limes, or cherries. 21 C.F.R. 101.22(i)(1)(i), (iii). Plaintiff does not allege that the characteristic lemon, lime, or cherry flavors of the products are not derived from lemons, limes, or cherries.

Because flavor enhancers are categorically different from flavors, a food or beverage may contain artificial flavor enhancers (or other artificial ingredients) and still use the statement "100% Natural Flavors." *See id.* at 888–89 (dismissing claims challenging "all natural flavors" statements based on the presence of artificial sweeteners or flavor enhancers).

This regulatory distinction between flavors and flavor enhancers forecloses Plaintiff's claim that 7-Up® products are inaccurately advertised as containing "100% Natural Flavors" or "All-Natural Flavors." In addition to citric acid, the complaint tries to allege that three other ingredients are artificial flavors: potassium citrate, calcium disodium EDTA, and artificial sweeteners. But the allegations in the complaint either fail to establish that fact or affirmatively establish that the ingredient is a flavor enhancer.

***Potassium citrate***: The complaint's allegation that potassium citrate has a "saline flavor profile," FAC ¶ 66, affirmatively establishes that potassium citrate is a flavor enhancer, not a flavor. "Saline" is a synonym for "salty." The complaint asserts that 7-Up® Products "purchased by Plaintiff" have a "lemon-lime flavor[]." *Id.* ¶ 11; *see also id.* ¶ 75. Because the Complaint alleges that the characterizing flavor of 7-Up® is lemon/lime, not salty, potassium citrate appears in 7-Up® "without imparting a characteristic taste or aroma of its own." 21 C.F.R. § 170.3(o)(11) (defining "flavor enhancer").

***Calcium disodium EDTA***: Only two paragraphs and one footnote in the complaint even mention calcium disodium EDTA, *see* FAC ¶¶ 76 & n.26, 90, and none of them alleges that it "impart[s] a taste or aroma in" 7-Up®, *see* 21 C.F.R. § 170.3(o)(12). Indeed, the complaint does not allege anything about how calcium disodium EDTA tastes or smells. In the absence of any allegation describing what calcium disodium EDTA's "original taste" is, the complaint necessarily cannot allege that calcium disodium EDTA imparts some (unknown) taste to 7-Up®. *See Viggiano*, 944 F. Supp. 2d at 889.

1  ***Artificial sweeteners***:  Paragraphs 74 and 75 try to plead that because some of the

2  zero-sugar lines of 7-Up® products contain two artificial sweeteners (aspartame and

3  acesulfame potassium, which is commonly referred to as ace-k), they do not contain

4  100% natural flavors.  Of course, Plaintiff did not buy a zero-sugar 7-Up® product.  *See*

5  FAC ¶¶ 89–91.  *See generally Rosen v. Tenne. Com'r of Fin. & Admin.*, 288 F.3d 918,

6  928 (6th Cir. 2002) (putative class representatives "cannot predicate standing on injuries

7  suffered by members of the class but which they themselves have not or will not suffer").

8  But his claim would fail even if he had.  "By definition," artificial sweeteners "do not

9  give the product an original taste—rather, they sweeten or amplify whatever

10 characterizing flavor it has from another source." *Viggiano*, 944 F. Supp. 2d at 889

11 (concluding that "neither sucralose nor ace-k is a 'flavor'").[2]

12     The complaint's characterization of these ingredients' collective effect on 7-

13 Up®'s taste further confirms that they are not flavors.  The complaint alleges that citric

14 acid, potassium citrate, and calcium disodium EDTA "enhance" the flavor of 7-Up®

15 (FAC ¶ 62), have "significance" to the drinks' "flavor profile" (*id.* ¶ 69), "materially

16 affect[]" the flavor (*id.* ¶ 70), "contribute[] meaningfully to their flavor systems and

17 overall flavor experience" (*id.* ¶ 71), "contribute[] to the flavor, flavor system, and

18 overall flavor experience" (*id.* ¶ 76), and "function[]" as "a component of the Product's

19 flavor" (*id.* ¶ 90).  Taken together, these allegations place citric acid, potassium citrate,

20 and calcium disodium EDTA squarely within the realm of "flavor enhancers" because

21 they demonstrate that these ingredients "supplement, enhance, or modify the original

22 taste and/or aroma of a food," 21 C.F.R. § 170.3(o)(11) (defining "flavor enhancers").

23

24

---

25 [2] Because citric acid is consistent with the "natural" part of the FDA's definition of a
"natural flavor," the Court need not decide whether the complaint properly alleges that

26 MCA is a flavor.  But the complaint does not.  It alleges that MCA has a "tart, tangy and

27 sour" taste.  FAC ¶ 62.  "Tart," "tangy," and "sour" are not flavors—they do not, and
could not, impart the "original" or "characteristic" tastes of lemon/lime and cherry.  *See*

28 *supra* n.1.

1   The sources cited in the complaint similarly suggest that citric acid and potassium citrate

2   serve to "enhance" or "improve" tastes, rather than impart their own characteristic taste.[3]

3         There are two final nails in the coffin.  First, the FDA allows flavors to be lumped

4   together in ingredient lists as "natural flavors" or "artificial flavors" without listing out

5   each specific flavor.  *See* 21 U.S.C. § 343(i).  By contrast, ingredients that serve purposes

6   other than to impart flavor (including flavor enhancers) must be listed separately in the

7   ingredient statement under their common and usual name.  *Id.*  Citric acid, potassium

8   citrate, and calcium disodium EDTA are all listed separately on the 7-Up® ingredient

9   statement under their common and usual name.  FAC ¶ 68.  Similarly, aspartame and

10  ace-k are listed on the ingredient statements of zero-sugar varieties of 7-Up®.  See *id.*

11  ¶ 55, 74–75.  The products' labels themselves thus refute Plaintiff's theory of liability.

12        Second, citric acid, potassium citrate, calcium disodium EDTA, ace-k, and

13  aspartame do not "appear[ ] on the lists of artificial flavors promulgated by the FDA."

14  *Viggiano*, 944 F. Supp. 2d at 889 (citing 21 C.F.R. § 172.515(b); 21 C.F.R. § 182.60).

15  As other courts have recognized, this absence indicates that citric acid, potassium citrate,

16  calcium disodium EDTA, and the two artificial sweeteners are not flavors under federal

17  law.  *See Ivie v. Kraft Foods Glob., Inc.*, 961 F. Supp. 2d 1033, 1041 (N.D. Cal. 2013)

18  (relying on the same regulations to conclude that potassium citrate and sodium citrate

19  are not flavors); *see also Viggiano*, 944 F. Supp. 2d at 889 (drawing the same conclusion,

20  based on the same regulations, about two artificial sweeteners, including ace-k).

21        Simply put, "nothing in the FDA regulations suggests that" citric acid, potassium

22  citrate, calcium disodium EDTA, aspartame, or ace-k "are *flavors*, artificial or

23  otherwise."  *See Ivie*, 961 F. Supp. 2d at 1041.  Those same regulations have been

---

[3] FAC ¶¶ 60–66 nn. 14, 17, 18, 22 (citing Sabrina Mores et al., *Citric Acid Bioproduction
and Downstream Processing: Status, Opportunities, and Challenges*, 320
BIORESOURCE TECH., 320, 321 (2021); B. Max, *Biotechnological Production of Citric
Acid*, 41 BRAZ. J. OF MICROBIOLOGY 862, 867 (2010); Xitrical, *Application of
Potassium Citrate in Beverages and Formulation Optimization*, (July 3, 2024),
https://www.xitrical.com/application-of-potassium-citrate-in-beverages-and-
formulation-optimization/).

1  incorporated into California law.  *See Min Sook Shin*, 773 F. App'x at 375 n.1.  As a

2  result, there is no basis to argue under either federal or state law that the inclusion of

3  these ingredients in 7-Up® products makes it false or misleading for third-party websites

4  to describe 7-Up® as containing "all-natural flavors" or "100% natural flavors."

5     **B. The FDCA's preemption provision bars Plaintiff from arguing that 7-**

6        **Up® contains artificial flavors.**

7        The FDCA would preempt any attempt to argue that California law differs from

8  federal law on how to classify the ingredients in 7-Up®.  The FDCA would preempt any

9  claim based on that argument because the statements on the third-party websites that

10  Plaintiff challenges in his complaint are "wholly in compliance with FDA regulations."

11  *Ivie*, 961 F. Supp. 2d at 1042.

12       The Supremacy Clause of the United States Constitution grants Congress the

13  power to preempt state law.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372

14  (2000).  In evaluating a statute's preemptive effect, courts are instructed that "the

15  purpose of Congress is the ultimate touchstone in every pre-emption case."  *Altria Grp.,*

16  *Inc. v. Good*, 555 U.S. 70, 76 (2008) (internal citations omitted).

17       As noted above, Congress's chief purpose in enacting the NLEA was to "establish

18  uniform food labeling requirements."  *Reid*, 780 F.3d at 959.  Critical to that effort is the

19  NLEA's express preemption provision, under which no state "may directly or indirectly

20  establish . . . any requirement for the labeling of food . . . that is not identical to the

21  requirement" of relevant federal regulations.  21 U.S.C. §§ 343-1(a)(2), (a)(3).  This

22  preemption provision gives the FDA "the sole power to establish various food labeling

23  requirements" in service of "the interest of promulgating nationally uniform labeling."

24  *Simpson v. California Pizza Kitchen, Inc.*, 989 F. Supp. 2d 1015, 1023–24 (S.D. Cal.

25  2013); *see also Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011) ("It is easy

26  to see why Congress would not want to allow states to impose disclosure requirements

27  of their own . . . .").

28

Gibson, Dunn &
Crutcher LLP

10

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MOTION TO
STRIKE

The statute's preemptive effective extends beyond the actual label on a food or beverage article.  The FDCA defines "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) *accompanying such article*."  21 U.S.C. § 321(m) (emphasis added).  As a result, preemption may extend to website statements if a plaintiff challenges them as "point-of-sale" representations.  *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1290 (9th Cir. 2021); *Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555, 561 (9th Cir. 1995); *Am. Meat Inst. v. Leeman*, 180 Cal. App. 4th 728, 757, 761 (2009) (point of sale representations constitute "labeling"); *Meaunrit v. ConAgra Foods Inc.*, 2010 WL 2867393, at \*8 (N.D. Cal. July 20, 2010) (same).  "That rule is logical and necessary.  Otherwise, plaintiffs could circumvent preemption by simply challenging an online picture of a label rather than the label itself."  *Cohen*, 16 F.4th at 1290.

The preclusive effect of the FDCA's express preemption provision extends to both statutory and common-law claims.  *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005).  Claims like those at issue here, which assert violations of state consumer protection statutes and related causes of action, contradict FDA regulations and therefore fall within the purview of the express preemption provision where the suit would impose labeling requirements "not identical" to those established by federal regulations.  *See Dvora*, 2011 WL 1897349, at \*3 ("Section 343-1(a) expressly preempts state regulation of . . . specified topics 'that is not identical' to the requirements in the FDCA in certain categories.").

## II.    The Court Should Strike Plaintiff's Nationwide Class Allegations

The Complaint should be dismissed in its entirety, with prejudice, for all of the independent reasons previously discussed.  In the event any claims survive, however, the Court should strike Plaintiff's nationwide class allegations.  The viability of a putative class is most often addressed in the context of a plaintiff's motion for class certification under Rule 23.  However, as the Supreme Court has explained, "[s]ometimes the issues are plain enough from the *pleadings* to determine whether the

1  interests of the absent parties are fairly encompassed within the named plaintiff's claim."

2  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (emphasis added). Thus, a

3  court may grant a motion to strike class allegations if it is clear from the complaint that

4  the class claims cannot be maintained. *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991

5  (N.D. Cal. 2009); *Torres v. Wells Fargo Bank*, 2018 WL 6137126, at *2 (C.D. Cal. Aug.

6  28, 2018).

7      Here, Plaintiff lacks standing to assert nationwide class claims. Although

8  Plaintiff's purported harm (if any) occurred in California, he brings his claims on behalf

9  of a nationwide class. FAC ¶ 110. But Plaintiff does not have standing to "pursue class

10  claims under the common laws of states to which the named plaintiffs have no

11  connection." *Soo v. Lorex Corp.*, 2020 WL 5408117, at *10 (N.D. Cal. Sept. 9, 2020)

12  (granting motion to dismiss nationwide class allegations because "Plaintiffs do not

13  identify any discovery that might permit them to bring claims under the laws of states to

14  which they have no connection; to defer ruling and permit nationwide discovery would

15  therefore merely waste time and money"); *see also Stewart v. Kodiak Cakes, LLC*, 537

16  F. Supp. 3d 1103, 1125 (S.D. Cal. 2021) ("Plaintiffs lack standing to bring claims under

17  the laws of the states where they do not reside or did not purchase the at-issue

18  products."); *In re Glumetza Antitrust Litig.*, 2020 WL 1066934, at *10 (N.D. Cal. Mar.

19  5, 2020); *Schertzer v. Bank of Am., N.A.*, 445 F. Supp. 3d 1058, 1073 (S.D. Cal. 2020)

20  (granting "the motion to dismiss the claims brought on behalf of a nationwide class"

21  because "the named plaintiffs must have been charged the . . . fee in the state under

22  whose laws they seek to bring the claims"); *Sponchiado v. Apple, Inc.*, 2019 WL

23  6117482, at *7 (N.D. Cal. Nov. 18, 2019) (dismissing claims brought under laws of other

24  jurisdictions) ("Deferring consideration of the standing analysis until the class

25  certification stage would permit Plaintiffs, who have no connection to the forty-nine

26  other jurisdictions, to embark on lengthy nationwide discovery."); *Van Mourik v. Big

27  Heart Pet Brands, Inc.*, 2018 WL 1116715, at *1–2 (N.D. Cal. Mar. 1, 2018).

28      Plaintiff's alleged injury occurred in California, so "the scope of standing is

therefore limited" to California.  *Soo*, 2020 WL 5408117, at *10.  "Resolving the question now as a matter of case management is consistent with Federal Rule of Civil Procedure 1 which requires the courts to construe the Rules of Civil Procedure 'to secure the just, speedy, and inexpensive determination of every action and proceeding.'"  *Id.* (quoting *Hindsman v. Gen. Motors LLC*, 2018 WL 2463113, at *16 (N.D. Cal. June 1, 2018)).  The Court should therefore strike or dismiss the nationwide class claims.[4]  *Id.*

## V.  CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiff's claims with prejudice and strike Plaintiff's class allegations.

DATED:  September 5, 2025            GIBSON, DUNN & CRUTCHER LLP

                                     By:    /s/ *Perlette Jura*
                                            Perlette Jura

                                     PERLETTE JURA, SBN 242332
                                     pjura@gibsondunn.com
                                     GIBSON, DUNN & CRUTCHER LLP
                                     333 South Grand Avenue
                                     Los Angeles, CA 90071-3197
                                     Telephone: 213.229.7000
                                     Facsimile: 213.229.7520

                                     JASON MELTZER (*pro hac vice*)
                                     jmeltzer@gibsondunn.com
                                     GIBSON, DUNN & CRUTCHER LLP

---

[4] Defendants, of course, reserve all of their rights to oppose any class certification motion filed by Plaintiff with respect to a nationwide or California class in this case.  Indeed, certification of any class here will be virtually impossible given the reliance requirements of Plaintiff's claims and the fact that Plaintiff challenges only scattered and differing third-party website statements that not all consumers likely saw, as opposed to any consistent labeling on the packaging of the products themselves.  *See, e.g.*, *Moorer v. StemGenex Med. Grp., Inc.*, 830 F. App'x 218, 220 (9th Cir. 2020) (rejecting class of consumers who visited a website, reasoning that a "class that includes those who never saw the alleged misrepresentation is overbroad because those persons were, by definition, not injured and cannot recover").

13

1                   1700 M Street

2                   Washington, D.C 20036

Telephone: 202.955.8500

3                   Facsimile: 202.467.0539

4

5                   RUSS FALCONER (*pro hac vice*)

rfalconer@gibsondunn.com

6                   GIBSON, DUNN & CRUTCHER LLP

2001 Ross Avenue Suite 2100

7                   Dallas, Texas 75201

8                   Telephone: 214.698.3100

Facsimile: 214.571.2900

9

10                 *Attorneys for Defendants*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MOTION TO STRIKE

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants, certifies that this brief contains 4,402 words, which complies with the word limit of L.R. 11-6.1.


DATED:  September 5, 2025                 GIBSON, DUNN & CRUTCHER LLP

                                         By:    /s/ *Perlette Jura*
                                                Perlette Jura

                                         Attorney for Defendants

Gibson, Dunn &
Crutcher LLP